2009 ND 43

**In the Interest of J.S.L., a child.**

**Grand Forks County Social Services, Petitioner and Appellee**

v.

**T.L. (Mother), Executive Director, North Dakota Department of Human Services, Bismarck, North Dakota, Respondents**

**and**

**W.M. (Identified Father), Respondent and Appellant.**

**No. 20080227.**

Supreme Court of North Dakota.

April 2, 2009.

Marie Miller (argued), third-year law student, appearing under the rule on the limited practice of law by law students, Jacqueline A. Gaddie (appeared), Assistant State's Attorney, and Christopher S. Pieske (on brief), third-year law student, appearing under the rule on the limited practice of law by law students, Grand Forks, ND, for petitioner and appellee.

Douglas W. Nesheim, Fargo, ND, for respondent and appellant.

**VANDE WALLE, Chief Justice.**

[¶ 1] W.M. appealed from a juvenile court judgment terminating his parental rights in his child, J.S.L. We affirm, holding the court did not err when it found clear and convincing evidence existed that J.S.L.'s deprivation was likely to continue, J.S.L. would likely suffer harm absent a termination of parental rights, and reasonable efforts were made to reunify the family once J.S.L. was removed into foster care.

## I.

[¶ 2] In August of 2007, the Child Protection Program at Grand Forks County Social Services received a report that T.L., at the time pregnant with J.S.L., had overdosed on medication. T.L. stated that she had taken the medication in an attempt to harm herself and her unborn child, and was placed in a psychiatric ward. Within two weeks J.S.L. was born and subsequently removed from the hospital and placed in foster care. At the time of J.S.L.'s birth, W.M. was living with T.L. but he had not yet acknowledged paternity of the child. However, over the next two months, both T.L. and W.M. attended visitation sessions with J.S.L. Katrina Johnson, a foster care case manager at Grand Forks County Social Services, testified at trial that she had supervised these sessions, and noted that on several occasions W.M. would fall asleep during visitation. While W.M. would correct his sleeping behavior in the "short-term," Johnson testified she had to remind him to stay awake on future visits.

[¶ 3] In October of 2007, T.L. began serving a prison sentence for unrelated charges for four years with two years suspended. In July of 2008, W.M. told a social worker that he and T.L. were still a couple, but that he was considering ending their relationship. Throughout the duration of their time together, T.L. and W.M. each faced charges of domestic violence for abusive acts against the other. In January of 2001, W.M. pled guilty to a charge of simple assault for striking T.L. in the face. In November of 2001, W.M. pled guilty to a charge of violating a temporary domestic violence protection order by coming into contact with T.L. In September of 2003, T.L. pled guilty to a charge of simple assault for striking W.M. in the head.

[¶ 4] During the time that T.L. was incarcerated in October of 2007, W.M. established his paternity as J.S.L.'s biological father. W.M. then began his own weekly visitation schedule with J.S.L. and attended sessions with Social Services to work on developmental tasks regarding the child. W.M. also had meetings with an infant development worker to cultivate ideas and goals that he could work on to help J.S.L. meet her developmental milestones. Johnson testified that she would

have to intervene during W.M.'s visits with J.S.L. because:

> [J.S.L.] would get very upset and fussy and cry to the point where co-workers would complain or be concerned of [J.S.L.'s] well-being because she would be so upset so we would have to intervene and kind of assist [W.M.] of finding a way to help soothe her.... It was pretty much every visit, and usually at least once.

Johnson noted that W.M. appeared to fall asleep again during one of these visits. Further, while W.M. generally attended his scheduled visits with J.S.L., there was a period of approximately one month, between the end of January 2008 to February 2008, during which he did not attend any visitations, explaining to Social Services that he "felt it was too cold."

[¶ 5] Around the time W.M. began his own visitation schedule with J.S.L., he completed a chemical dependency evaluation at Northeast Human Service Center ("Northeast"). The recommendation from the report was that W.M. complete chemical dependency treatment, follow through with a case manager at Northeast, and look into entering gambling addiction treatment. An offer to attend chemical dependency treatment was made to W.M. in November of 2007, but he refused to attend. He again turned down treatment in January of 2008. W.M. did begin the program in March of 2008 and completed it in June of that year. Before he entered the program, W.M. had not maintained sobriety, and admitted to Social Services that he had consumed alcohol at least once after completing treatment, and had therefore not attended his Aftercare program. While W.M. told Social Services that he would not drink in front of J.S.L., he did not make a similar commitment to refrain from drinking altogether.

[¶ 6] Once W.M. completed his chemical dependency program, he was allowed to begin working with Ann Tollefsrud, a social worker with Grand Forks County Social Services, on parenting skills training. W.M. also began working with a parenting aide, both individually and jointly with J.S.L. Tollefsrud testified she had to intercede on occasion to assist W.M. when handling J.S.L.; in one instance, he dumped Cheerios on J.S.L.'s high chair tray, and the child began stuffing them into her mouth, causing Tollefsrud to intervene out of concern that J.S.L. would choke. Tollefsrud also testified that she had to encourage W.M. to be more interactive with J.S.L. as he was "pretty quiet and he didn't really say too much ... and the child was kind of waiting for something to happen." In particular, Tollefsrud told W.M. to smile and talk to his daughter. Tollefsrud further testified that, on another occasion, when J.S.L. began to cry, W.M.'s only idea was to console her with her bottle; when he was unable to find the bottle he became agitated and began repeating aloud that J.S.L. needed a bottle, leaving her on the floor without trying to pick her up, console her, or give her a pacifier. Tollefsrud testified she believed that W.M. would become uncomfortable when J.S.L. began to fuss, and was at a loss at how to calm her down beyond feeding her. At trial, Tollefsrud gave a general assessment of W.M.'s ability to adapt to Social Services' suggestions:

> [I]f you tell [W.M.] something, he may remember that fact but he doesn't know how to implement it through other things.... [I]f you were to say the baby doesn't need the pacifier today, he might not know that maybe later on the baby's going to need that. You know, he doesn't have that skill to assess different times that the child may need something. So he may follow your, just that one direction.

[¶ 7] While W.M. was given parental skills training, the Child Protection Program assembled a Child Protection Assessment Report ("CPA Report") on J.S.L. The Report was based on information provided from several individuals, including social workers, case managers, and a psychologist. The Report was primarily concerned with T.L., but also contained some basic information about W.M., including general information about his chemical dependency and mental health. Based on the findings of the CPA Report, the Program team found there to be psychological maltreatment of J.S.L., and that T.L. and W.M. both lacked the ability, knowledge and parenting management skills to be able to provide care and keep a child safe.

[¶ 8] In April of 2008, Grand Forks County Social Services filed a petition to involuntarily terminate the parental rights of T.L. and W.M. A hearing was held in August of 2008. During the course of the trial, the juvenile court allowed the CPA Report into evidence over objection by T.L.'s counsel that the Report was inadmissible hearsay. The court found that the Report was admissible under the residual exception in Rule 807 of the North Dakota Rules of Evidence. Also at trial the issue arose over W.M.'s mental health status. W.M.'s counsel objected to any social worker testifying as an expert witnesses. In response to the objection during Johnson's testimony, the court stated:

> I'm going to reserve ruling on her expertise. It depends upon what the question is as to whether she ... can answer the question based ... on her experience and training to be qualified as an expert. Experts can testify about certain things and not other things and sometimes it's expert testimony and sometimes it's just based upon what her observations are. So I'm going to reserve ruling on, on qualifying her as an expert because she may be an expert in some areas and not in other areas.

The court made similar rulings on the other witnesses at trial.

[¶ 9] While none of the witnesses were qualified as experts on mental health, the witnesses made several non-diagnostic references to W.M.'s condition which they observed and came to know through working with W.M. over the period of several months. Johnson testified that, while she was working with W.M., she had concerns about his mental health and chemical dependency, as well as his relationship with T.L. Johnson also described a meeting she had with W.M. where he "became very angry and physically got agitated and made a comment about feeling like hurting somebody so he left the meeting." Johnson also testified that there were instances where W.M. would call her a "bitch" during meetings. Shari Fielder, the supervisor of the Grand Forks County Social Services Child Protection Program, testified on direct examination that Social Services had concerns over W.M.'s mental health. On cross-examination, W.M.'s counsel again raised the issue of W.M.'s mental health with Fielder. During this examination, Fielder testified that her knowledge of W.M.'s mental health and chemical dependency problems came directly from W.M. and through follow-up reports by individuals with whom W.M. worked on his mental health problems. W.M.'s counsel asked Fielder if she was aware of what W.M.'s diagnosis was, to which Fielder responded that she had learned he was diagnosed with a schizoaffective disorder. Later, during the cross-examination of Kris Beck, the lay guardian ad litem appointed to J.S.L.'s case, W.M.'s counsel again probed the witness on W.M.'s mental health, and for the first time elicited testimony that W.M. had suffered from hallucinations where he believed that angels were directing his actions, that he argued with

these angels over whether he should take a certain direction, and that he could read people's spirits and thoughts.

[¶ 10] Fielder, Johnson, Tollefsrud and Beck each testified that, in their opinion, J.S.L. was a deprived child and the court should terminate the parental rights of T.L. and W.M. On August 25, 2008, the juvenile court issued its memorandum decision, finding that J.S.L. was a deprived child, that the deprivation was likely to continue, and that it would be in the best interests of the child to terminate the parental rights of T.L. and W.M. Specifically, the court found that both T.L. and W.M. suffered from mental problems which would likely endanger the child, and that W.M. also had chemical dependency problems which would make caring for J.S.L. dangerous. The court also found that reasonable efforts had been made to prevent or eliminate the need to terminate parental rights. The court then ordered that T.L. and W.M.'s parental rights be terminated and J.S.L. be placed for adoption.

II.

[¶ 11] On appeal, W.M. argues the juvenile court erred when it found there was clear and convincing evidence to support findings that J.S.L.'s deprivation was likely to continue, and that J.S.L. would likely suffer harm absent a termination of parental rights. W.M. further contends the court erred when it found that reasonable efforts had been made to prevent removal of the child and reunify him with J.S.L.

[¶ 12] A court may terminate a parent's rights in their child, providing: (1) the child is a deprived child; (2) the conditions and causes of the deprivation are likely to continue; and (3) the child is suffering, or will in the future probably suffer serious physical, mental, moral or emotional harm. N.D.C.C. § 27–20–44(1)(c). A party seeking termination of parental rights must prove all elements by clear and convincing evidence. *In re D.Q.*, 2002 ND 188, ¶ 19, 653 N.W.2d 713. On appeal, findings of fact in juvenile matters shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. N.D.R.Civ.P. 52(a).

III.

[¶ 13] W.M. does not challenge the juvenile court's finding that J.S.L. was a "deprived child" as defined in N.D.C.C. § 27–20–02(8)(a). Rather, W.M. argues the court erred when it found there was clear and convincing evidence that J.S.L.'s deprivation was likely to continue. W.M. contends the evidence at trial was not sufficient to assess W.M.'s mental health, and the court wrongfully admitted the CPA Report into evidence under Rule 807 of the North Dakota Rules of Evidence. W.M. further argues the evidence regarding his ability to parent was insufficient.

[¶ 14] In a case involving the termination of parental rights, the State must prove the child's deprivation is likely to continue or will not be remedied. N.D.C.C. § 27–20–44(1)(c)(1). The State cannot rely on past deprivation alone to show that deprivation will continue, but must provide prognostic evidence which demonstrates the deprivation will continue. *In re M.B.*, 2006 ND 19, ¶ 16, 709 N.W.2d 11. "Prognostic evidence, including reports and opinions of the professionals involved, that forms the basis for a reasonable prediction as to future behavior must be evaluated in determining if a child's deprivation is likely to continue." *In re D.Q.*, 2002 ND 188, ¶ 21, 653 N.W.2d 713.

A. Evidence Regarding W.M.'s Mental Health and Chemical Dependency

[¶ 15] W.M. contends no qualified witnesses testified on the state of his men-

tal health and no licensed addiction counselor testified about his chemical dependency. However, the testimony elicited at trial provided ample prognostic evidence about W.M.'s chemical addiction and mental illness. Johnson testified that W.M. "has not demonstrated stability with mental health nor with his chemical dependency and his sobriety," and expressed her concern that W.M.'s mental health and sobriety may affect his ability to meet J.S.L.'s needs. Johnson also detailed W.M.'s history of rejecting and finally entering a chemical dependency program. Tollefsrud testified regarding W.M.'s admission that he drank after going through the program, and his contention that he would not drink while around J.S.L. Beck testified, on cross-examination, about the particulars of W.M.'s mental health, including his diagnosis as having a schizoaffective disorder, and his various hallucinations.

[¶ 16] While none of these witnesses were qualified as experts during the trial, their statements regarding these matters did not require they be qualified as expert witnesses. *See* N.D.R.Ev. 702 ("If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert . . . may testify thereto in the form of an opinion or otherwise."). Rather, on direct examination, the witnesses testified on matters which they personally learned through either W.M. himself or the counselors who worked with him on his mental health and chemical dependency. *See* N.D.R.Ev. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). Other statements made by the witnesses were simply statements reflecting W.M.'s actions and their own observations. The only time evidence regarding

W.M.'s mental health became more specific was on cross-examination, when W.M.'s own counsel inquired about the specific diagnosis of W.M.'s mental health problems and the symptoms that W.M. experienced. It was only in response to W.M.'s counsel's questions that it was revealed W.M. had been diagnosed with a schizoaffective disorder and had been having hallucinations involving speaking with angels and reading people's thoughts.

[¶ 17] W.M. also argues the juvenile court improperly entered the CPA Report into evidence under Rule 807 of the North Dakota Rules of Evidence. The CPA Report provided further information regarding W.M.'s chemical dependency and mental health. Rule 807, the residual hearsay exception, reads:

A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

The rule further requires evidence introduced under 807 be made known to the adverse party and the court sufficiently in advance of trial to provide the adverse party a fair opportunity to prepare to meet it. *Id.*

[¶ 18] At trial, the court announced its intent to admit the CPA Report under the residual exception, stating:

The Court's going to receive the document into evidence under Rule 807 which is the residual exception to the

hearsay rule and that is that sufficient notice has been provided to opposing counsel and sufficiently in advance to give opposing counsel the opportunity to examine the preparer of the statement. And the Court's, as I say, is receiving it under Rule 807.

The court addressed the advance notice requirement of Rule 807, but did not mention the rule's requirements that the statement is offered as evidence of a material fact, is more probative than other evidence which can be procured through reasonable efforts, and will serve the interests of justice and the purpose of the rules of evidence. However, a district court has broad discretion on evidentiary matters, and this Court will not reverse a lower court's decision to admit or exclude evidence absent an abuse of discretion. *Forster v. West Dakota Veterinary Clinic, Inc.*, 2004 ND 207, ¶ 40, 689 N.W.2d 366. A court abuses its discretion when it acts in an arbitrary, unreasonable or unconscionable manner, or if it misinterprets or misapplies the law. *State v. Ramsey*, 2005 ND 42, ¶ 8, 692 N.W.2d 498. When a court does not make detailed findings when admitting evidence under a residual exception, an appellate court may review the record to determine if the prerequisites to admissibility have been met. *F.T.C. v. Figgie Int'l, Inc.*, 994 F.2d 595, 608 (9th Cir.1993).

[¶ 19] The CPA Report meets the requirement in Rule 807 that the statement have guarantees of trustworthiness. In *United States v. Banks*, 514 F.3d 769 (8th Cir.2008), the 8th Circuit Court of Appeals set forth an analysis a court would take when determining whether a piece of hearsay evidence was sufficiently trustworthy to allow under a residual exception to the rule. The court stated that courts should inquire into the reliability and necessity for the statement, which can be done by comparing the circumstances surrounding the statement to the closest applicable hearsay exception. *Id.* at 777; *see also United States v. Fernandez*, 892 F.2d 976, 981 (11th Cir.1989) ("If the proponent can show that a particular piece of hearsay carries 'circumstantial guarantees of trustworthiness' equivalent to one of the ... codified exceptions, that statement should be admissible regardless of its affinity to a statement falling squarely within a codified exception.").

[¶ 20] In *In re B.B.*, 2007 ND 115, 735 N.W.2d 855, this Court held that child assessment reports, such as the CPA Report at issue in this case, contain hearsay within hearsay. *Id.* at ¶ 8. We further held the report was not admissible under the business records exception because of the presence of statements made by individuals who were not acting in the regular course of business, and because the person who prepared the report did not have personal knowledge of the events detailed in those statements. *Id.* We did note that such statements may be admissible under the public records exception in N.D.R.Ev. 803(8). *Id.* at ¶ 9; *see also* Christopher B. Mueller and Laird C. Kirkpatrick, 4 *Federal Evidence* § 8:84 (3d. ed. 2007) (noting that the foundation requirements for the business records exception are stricter than those for the public records exception). However, we declined to further consider the issue because the State did not offer the report under the public records exception, and we will not decide issues raised for the first time on appeal. *B.B.*, 2007 ND 115, ¶ 9, 735 N.W.2d 855. *In re B.B.* is distinguishable from the present case. The CPA Report was admitted under Rule 807, which permits analysis into whether such a report includes statements admissible under the public records exception to the hearsay rule.

[¶ 21] The public records exception to the hearsay rule permits the admission of:

Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (i) the activities of the office or agency, or (ii) matters observed pursuant to duty imposed by law as to which matters there was a duty to report ... or (iii) in civil actions and proceedings and against the State in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

N.D.R.Ev. 803(8). The public records exception further requires that the proponent furnishes to the party against whom they are offered a copy of the factual findings, or the relevant portions thereof. *Id.* Here, the CPA Report was conducted by Grand Forks Social Services—a public agency—pursuant to the agency's duty under the law to provide child protection services and to ensure the safety of the children in its jurisdiction. Further, a copy of the report was furnished to W.M. and T.L. in advance of trial. The hearsay statements contained within the report come within the purview of the public records hearsay exception, and meet the trustworthiness requirement of Rule 807.

[¶ 22] However, W.M. further contends the CPA Report did not meet the Rule 807 requirement that the State could not offer any other evidence which the proponent could procure through reasonable efforts. *See* N.D.R.Ev. 807. Specifically, W.M. argues there was no evidence that the testimony of the care givers, addiction counselor, mental health professionals and social workers quoted in the CPA Report could not have been procured on the stand at trial rather than by entering the Report in their stead.

[¶ 23] The requirement that hearsay evidence be allowed under Rule 807 only if the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts is included in the rule to assure the residual exception is reserved for cases of "clear necessity." Stephen A. Saltzburg et al., 4 *Federal Rules of Evidence Manual* § 807.02[5] (9th ed. 2006). This has generally led to the principle that live testimony is more probative than, or at least equally as probative as, hearsay evidence on the same point. *Id.* The rule does include the term "reasonable" to describe the efforts to procure live testimony because, in some situations, it would be unreasonably prohibitive and time-consuming to demand the declarant testify in court. *Id.*; *see also Figgie Int'l, Inc.*, 994 F.2d at 608–09 (admitting 127 letters from consumers under residual hearsay exception as it would not be reasonable to bring the letter-writers into court). However, it has frequently been held that hearsay statements are "more probative" only if the lower court determines that no other evidence, or very little other evidence, is available on the same point. 5 *Weinstein's Federal Evidence* § 807.03[3][a] (2d ed. 2008). Federal courts have frequently held evidence inadmissible when other evidence on the same point was readily available. *See Eisenstadt v. Centel Corp.*, 113 F.3d 738, 743–45 (7th Cir.1997) (holding newspaper article not admissible as plaintiff could easily have deposed reporter or obtained reporter's affidavit); *United States v. Cardascia*, 951 F.2d 474, 489 (2d Cir.1991) (holding letter of resignation not admissible under residual exception when other evidence on the same point, including testimony by the letter's author, was available); *Marsee v. United States Tobacco Co.*, 866 F.2d 319, 324–25 (10th Cir.1989) (holding reports not admissible because much of their contents already admitted through expert testimony).

[¶ 24] Here, the information contained in the CPA Report was trustworthy, but it was not more probative than other evidence pointing to W.M.'s mental health and chemical dependency. The CPA Report primarily focused on T.L., with W.M.'s conditions brought up only in vague, fleeting detail. The testimony at trial of Fielder, Johnson, Tollefsrud and Beck provided more in-depth evidence on W.M.'s mental health and chemical dependency, including his diagnosis of having a schizoaffective disorder and the information that he had suffered from hallucinations. As one treatise states, the likely meaning behind the "more probative" provision of the residual exception is "that the proponent may invoke the catchall only if there is no better evidence in reasonable reach." Christopher B. Mueller and Laird C. Kirkpatrick, 5 *Federal Evidence* § 8:142 (3d. ed. 2007). The testimony of Fielder, Johnson, Tollefsrud and Beck was indeed "better evidence" than the information about W.M. contained in the CPA Report. Therefore, while the Report may have been admissible under the combined force of the business records exception and the public records exception, the court's decision to admit the Report under the residual exception was an abuse of discretion, as it either misapplied or misinterpreted the law in regard to the probative nature of the Report. *See Ramsey,* 2005 ND 42, ¶ 8, 692 N.W.2d 498 (stating that a court abuses its discretion when it misinterprets or misapplies the law).

▮ [¶ 25] However, this does not end our analysis on the issue, as we find that the admission of the CPA Report under Rule 807 was not reversible error. *See* N.D.R.Civ.P. 61 (setting forth rule on harmless error). In *Zimmerman v. Zimmerman,* 1997 ND 182, 569 N.W.2d 277, this Court considered the admission of a child abuse investigation report in a trial litigating the custody of a child. We began by noting that the report contained statements of persons other than the individual writing the report, were not made in court and not under oath, and were therefore hearsay and inadmissible. *Id.* at ¶ 12 (*citing Fuhrman v. Fuhrman,* 254 N.W.2d 97, 100 (N.D.1977)). However, we observed that the introduction of allegedly inadmissible evidence in a non-jury case is rarely reversible error, and we would only reverse such a holding if "all the competent evidence is insufficient to support the judgment or unless it affirmatively appears that the incompetent evidence induced the court to make an essential finding which would not otherwise have been made." *Id.* at ¶ 13 (*quoting Lithun v. Grand Forks Public School Dist. No. 1,* 307 N.W.2d 545, 550 (N.D.1981)). We further noted that the district court specifically stated it was not going to decisively rely on the investigation report in making its custody decision, and were therefore not convinced incompetent hearsay evidence induced the court to make an essential finding which the court would not have otherwise made based upon additional, relevant admissible evidence in the case. *Id.* at ¶ 13.

[¶ 26] While the case before us is distinguishable from *Zimmerman* and *Fuhrman* in that the public records exception to the hearsay rule was not raised in those cases, the admission of the CPA Report in the present action yields a similar result. We are not convinced that incompetent hearsay evidence induced the court to make essential findings regarding W.M.'s mental health and chemical dependency. Relevant admissible evidence was presented at trial through the testimony of Fielder, Johnson, Tollefsrud and Beck regarding these matters which was more particular and persuasive than the evidence on W.M.'s mental health and chemical dependency in the CPA Report. In

the court's Memorandum Decision of August 15, 2008, it detailed the testimony elicited on W.M.'s mental health and chemical dependency, along with mentioning the CPA Report as "document[ing] the serious problems that [T.L.] and [W.M.] have concerning parenting."

[¶ 27] The admission of the report was not reversible error. There was sufficient evidence admitted through testimony at trial of W.M.'s mental health and chemical dependency.

### B. Evidence Regarding W.M.'s Ability to Parent

[¶ 28] W.M. argues the evidence regarding his ability to parent does not support the court's finding that J.S.L.'s deprivation was likely to continue.

[¶ 29] Prognostic evidence was introduced at trial through testimony regarding W.M.'s ability to parent. Fielder stated she believed deprivation was likely to continue due to the "minimal and sporadic cooperation with social services on [W.M.'s] part." Tollefsrud believed deprivation would continue because W.M. "does not have the ability to learn and to transmit and to use the information to the safety of who's ever in his care." Tollefsrud also pointed to several occasions during W.M.'s interactions with J.S.L. when he was unaware of how to handle his daughter, letting her stuff Cheerios in her mouth, leaving her on the floor instead of soothing her, and being unable to assess that J.S.L. may need different forms of care in different situations. Beck pointed to W.M.'s inability to "make that intuitive leap in parenting," and noted that while W.M. "tries," she believed he did not have the ability to parent. Johnson discussed W.M.'s inability to soothe J.S.L. during his sessions with her, that W.M. had fallen asleep during parenting sessions, and the month of visitation sessions he skipped

because he "felt it was too cold." Johnson also testified about W.M.'s burst of anger during one session, and the occasions where he would refer to her as a "bitch."

[¶ 30] In *Interest of T.J.L.*, 2004 ND 142, 682 N.W.2d 735, this Court affirmed an order terminating parental rights, in part due to the insufficient parenting abilities and conflicts with social services displayed by the biological parents. Like W.M., the parents in *T.J.L.* were entered into a parenting skills program, but despite the sessions had difficulty caring for their child and did not know what to do when she would start to cry. *Id.* at ¶ 7. While the *T.J.L.* parents had visitations and sessions for over a year, their parenting abilities had steadily decreased, and they did not have the capability to grow mentally along with their child. *Id.* at ¶¶ 7–10. There had also been instances where the parents avoided accepting services offered to them by the state, and "adopted an adversarial relationship with the service providers." *Id.* at ¶ 10. This Court held that, when there has been an extensive period in which efforts have been made to overcome a parent's inabilities to effectively parent, the courts cannot allow the child to remain in an indeterminate status midway between foster care and the need for permanent placement. *Id.* at ¶ 11.

[¶ 31] Here, W.M. had also received parenting skills training, and did not show signs of growth in his ability to parent. While W.M. argues that some of this training did not commence until "a matter of weeks prior to trial," this training was only delayed because of W.M.'s refusal to attend a chemical dependency program. Further, W.M. also displayed hostility and a level of adversity to the Social Services workers, calling Johnson a "bitch" and exhibiting fits of anger. A child cannot remain in an indefinite, indeterminate status,

and there was clear and convincing evidence that W.M.'s lack of parenting abilities would keep J.S.L. in such a status absent a termination of parental rights.

## IV.

[¶ 32] W.M. next argues the juvenile court erred in finding there was clear and convincing evidence that J.S.L. would likely suffer harm absent a termination of parental rights. Specifically, W.M. argues that no child psychologists or experts on child development testified at trial, and that the social workers who did testify were neither qualified as experts nor laid a foundation for their testimony regarding the likelihood of harm to J.S.L.'s development or safety.

[¶ 33] Upon a showing that a child's deprivation is likely to continue in an action to terminate parental rights, it must be shown that the child is suffering or will probably suffer some serious physical, mental, moral, or emotional harm. N.D.C.C. § 27–20–44(1)(c)(1). The probability of serious mental and emotional harm to a child may be established by prognostic evidence that a parent's current inability to properly care for the child will continue long enough to render improbable the successful assimilation of the child into a family if the parent's rights are not terminated. *In re C.R.*, 1999 ND 221, ¶ 10, 602 N.W.2d 520. As this Court noted in *C.R.*, there are "grave problems implicit in making a deprived child assume the risks of waiting to see if a parent can turn his or her life around to become adequate for the parental role." *Id.* at ¶ 11.

[¶ 34] Although expert witnesses may testify to the probability of harm to a child, we have not required expert testimony to prove the elements necessary to terminate parental rights. *See, e.g., Interest of J.S.*, 351 N.W.2d 440, 442 (N.D.1984) (stating that an expert expressing a factu-ally supported opinion would have been helpful but facts of the case readily led to conclusion that deprivation would continue). Here, each witness at trial testified to J.S.L.'s continuing deprivation, and W.M.'s continuing struggle to adapt as a parent. There was no indication by any of these witnesses that W.M. would be prepared to handle the role of a parent, without the supervision of social workers, anytime in the foreseeable future. Even if W.M. continued to work at enhancing his parenting skills, controlling his mental health problems, and staying sober, J.S.L. could find herself in familial limbo for years to come. It was not clearly erroneous for the lower court to find that making J.S.L. wait for such a time to see whether or not W.M. would begin to be a suitable guardian could cause her to suffer serious harm.

[¶ 35] W.M. also argues that his relationship with T.L. should not have been a factor in the lower court's decision. Specifically, W.M. contends their relationship was "no longer an issue" at trial, as T.L. was incarcerated "and likely to be for some months," and that testimony indicated that W.M. "had moved on and left the relationship behind." A parent's failure to address issues of domestic violence that occur in the home places a child in a position of probable serious physical, mental, or emotional harm. *See In re K.L.*, 2008 ND 131, ¶ 24, 751 N.W.2d 677. While W.M. did tell a social worker that he was considering ending his relationship with T.L., the tumultuous nature of their relationship raises the concern that, whether or not W.M. did indeed try to sever his ties with T.L., their contact with each other has not run its course. In the past, both T.L. and W.M. have pled guilty to assault charges after committing acts of domestic violence against each other, and W.M. pled guilty to violating a domestic violence re-

straining order aimed at keeping him from T.L. Regardless of these legal measures, and the unhealthy nature of their relationship at these junctures, the couple continued to maintain a relationship, during which time they conceived J.S.L. Nor does T.L.'s incarceration end the question of future contact; by W.M.'s own assertion, T.L.'s incarceration would "likely" last for "some months." Such a time span does not preclude the possibility of contact in the near future. The history of W.M.'s relationship with T.L. was relevant to the determination of whether J.S.L. would probably suffer harm absent a termination of parental rights, and the court did not err when it found clear and convincing evidence existed that J.S.L. would likely suffer such harm.

## V.

[¶ 36] W.M. argues the juvenile court erred when it found reasonable efforts were made to reunify J.S.L. and W.M., contending that "[m]ore assistance was reasonably appropriate and not offered." Specifically, W.M. argues his parental assessment was not completed until July 2008, shortly before the trial began, and he had been given insufficient time to work with a parent aide. Further, he states there is no evidence he was provided with reasonable parenting education in order to make it possible for him to succeed in the long term.

[¶ 37] Section 27–20–32.2(1), N.D.C.C., requires the State to use "appropriate and available services to meet the needs of the child and the child's family in order to prevent removal of the child from the child's family or, after removal, to use appropriate and available services to eliminate the need for removal and to reunite the child and the child's family." It is not enough that a parent indicates a desire to improve behavior; rather, the

parent also must be able to demonstrate present capacity, or capacity within the near future, to be an adequate parent. *McBeth v. M.D.K.*, 447 N.W.2d 318, 322 (N.D.1989). An agency does not have to "exhaust every potential solution" before it initiates an action to terminate parental rights. *In re J.S.*, 2008 ND 9, ¶ 19, 743 N.W.2d 808.

[¶ 38] In its order terminating parental rights, the juvenile court made note of the various efforts made by the State in this matter, including: foster care case management, regular child and family team meetings, legal intervention, psychiatric and psychological evaluations and therapy, chemical dependency evaluations and treatment, parenting classes, parent aide, and supervised visitation. These findings are consistent with the testimony at trial, in which the witnesses detailed the different programs and assistance provided to W.M. over the course of their work with him. While parenting assistance did not begin until July 2008, this delay was the result of W.M.'s earlier refusals to enter chemical dependency treatment. The evidence before the juvenile court was sufficient to conclude Social Services made reasonable efforts to reunite W.M. and J.S.L., and therefore the court's decision is not clearly erroneous.

## VI.

[¶ 39] The judgment of the juvenile court is affirmed.

[¶ 40] DALE V. SANDSTROM, DANIEL J. CROTHERS, MARY MUEHLEN MARING, and CAROL RONNING KAPSNER, JJ., concur.