2011 ND 152

In the Interest of K.B., a Child.

Cass County Social Service Center,
Petitioner and Appellee

v.

N.M., Mother, and M.M.,
Father, Respondents
and Appellants.

In the Interest of W.M., a Child.

Cass County Social Service Center,
Petitioner and Appellee

v.

N.M., Mother, and M.M.,
Father, Respondents
and Appellants.

In the Interest of J.M., a Child.

Cass County Social Service Center,
Petitioner and Appellee

v.

N.M., Mother, and M.M.,
Father, Respondents
and Appellants.

In the Interest of P.M., a Child.

Cass County Social Service Center,
Petitioner and Appellee

v.

N.M., Mother, and M.M.,
Father, Respondents
and Appellants.

Nos. 20110092, 20110093,
20110094, 20110095.

Supreme Court of North Dakota.

Aug. 11, 2011.

Constance Louise Cleveland, Assistant State's Attorney, Fargo, N.D., for petitioners and appellees.

Jared Sharp Simonson, Fargo, N.D., for respondent and appellant N.M.

Gene William Doeling Jr., Fargo, N.D., for respondent and appellant M.M.

VANDE WALLE, Chief Justice.

[¶ 1] N.M. and M.M. appealed from a juvenile court order terminating their parental rights to their four minor children, arguing the juvenile court erred in finding two of the children, K.B. and P.M., are deprived. We affirm, concluding the juvenile court did not clearly err in finding

K.B. and P.M. are deprived and terminating the parents' parental rights to those two children.

I

[¶ 2] N.M. and M.M. are the parents of K.B., born in 2007; W.M. and J.M., special-needs twins born prematurely in 2008; and P.M., born in 2010. When K.B. was born in 2007, N.M. lived with her parents. N.M. moved in with M.M., when K.B. was about eight months old. When K.B. was ten months old, J.M. and W.M. were born prematurely. On November 14, 2008, when the twins were about five months old, W.M. was admitted to the hospital for head trauma. At the time, the parents claimed a car seat had landed on W.M. when K.B. pulled the seat off a sofa. Treating physicians, however, opined that the parents' explanation was inconsistent with W.M.'s injuries and that the actual nature of W.M.'s injuries was consistent with "shaken baby syndrome." On November 17, 2008, K.B., W.M., and J.M. were placed in the custody of Cass County Social Services.

[¶ 3] On May 22, 2009, the juvenile court adjudicated K.B., W.M., and J.M. as deprived children and placed them in the care, custody, and control of Cass County Social Services for nine months. At a May 2009 hearing, the parents admitted the children were deprived, and the parents agreed to comply with a reunification plan for their children.

[¶ 4] In February 2010, however, the State petitioned to terminate the parents' parental rights to K.B., W.M., and J.M. In March 2010, while the termination petition was pending, the parents had another child, P.M., and Social Services immediately took custody of P.M. and placed him in foster care. In May 2010, an amended petition for termination of parental rights was filed to include the newborn P.M.

[¶ 5] At the beginning of the termination hearing, N.M. and M.M. each consented to termination of their parental rights to the special-needs twins. After several days of trial in July and September 2010, a judicial referee issued a decision terminating the parents' parental rights to all four children. The referee found the children are deprived, the deprivation is not due primarily to the lack of financial means of the parents, the deprivation is likely to continue or will not be remedied, and the children are suffering or will probably suffer serious physical, mental, moral, or emotional harm. The referee found that W.M. had suffered injuries consistent with shaken baby syndrome in November 2008 and that only the parents had cared for W.M. and his siblings during the relevant time period. The referee found that despite reasonable efforts to reunify the family, services and treatment have not abated the causes of the deprivation. The referee found the parents were unable to recognize safety concerns and implement behaviors to protect the children, were unable to develop or provide stability and consistency for the children's basic needs, were unable to demonstrate behaviors providing nurturing and support for the children's special needs, and unable to demonstrate improvements in parenting skills. The referee found that M.M. had failed to actively address his own physical health needs, which adversely affected his ability to physically and emotionally provide for his children's needs, and that N.M. had been unable to develop skills and behaviors to cope with stress and anxiety. The referee also found K.B., W.M., and J.M. had been in foster care in excess of 450 days since November 2008, and P.M. had been in foster care since his birth in March 2010.

[¶ 6] N.M. and M.M. requested review of the referee's order. After making addi-

tional findings and conclusions, the juvenile court adopted and affirmed the referee's findings and order.

## II

[¶ 7] Under N.D.C.C. § 27–20–44(1)(c), a juvenile court may terminate parental rights if there is clear and convincing evidence: 1) the child is a deprived child; 2) the conditions and causes of the deprivation are likely to continue; and 3) the child is suffering, or will in the future probably suffer serious physical, mental, moral or emotional harm. *See Interest of K.J.*, 2010 ND 46, ¶ 4, 779 N.W.2d 635; *Interest of J.S.L.*, 2009 ND 43, ¶ 12, 763 N.W.2d 783. A court may also terminate parental rights if the court finds the child is a deprived child and "[t]he child has been in foster care, in the care, custody, and control of the department, or a county social service board, . . . for at least four hundred fifty out of the previous six hundred sixty nights." N.D.C.C. § 27–20–44(1)(c)(2); *see Interest of F.F.*, 2006 ND 47, ¶ 14, 711 N.W.2d 144. "The party seeking parental termination must prove all elements by clear and convincing evidence." *Interest of E.R.*, 2004 ND 202, ¶ 5, 688 N.W.2d 384. Clear and convincing evidence is evidence that leads to a firm belief or conviction the allegations are true. *Interest of A.B.*, 2009 ND 116, ¶ 16, 767 N.W.2d 817.

[¶ 8] On appeal, we review "the files, records, and minutes or transcript of the evidence of the juvenile court, giving appreciable weight to the findings of the juvenile court." N.D.C.C. § 27–20–56. We will not overturn a juvenile court's decision on appeal unless the findings of fact are clearly erroneous under N.D.R.Civ.P. 52(a). A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if no evidence exists to support the finding, or if, on the entire record, we

are left with a definite and firm conviction a mistake has been made. *Interest of K.J.*, 2010 ND 46, ¶ 5, 779 N.W.2d 635. Under N.D.R.Civ.P. 52(a), we do not re-weigh conflicting evidence, and we give due regard to the trial court's opportunity to judge the credibility of witnesses. *See Interest of J.S.L.*, 2009 ND 43, ¶ 12, 763 N.W.2d 783; *Brandt v. Somerville*, 2005 ND 35, ¶ 12, 692 N.W.2d 144. "A trial court's choice between two permissible views of the weight of the evidence is not clearly erroneous, and simply because we may have viewed the evidence differently does not entitle us to reverse the trial court." *Brandt*, at ¶ 12. The court's findings should provide "sufficient specificity to enable a reviewing court to understand the factual basis for the trial court's decision." *Id.*

## III

[¶ 9] N.M. and M.M. consented to the termination of their parental rights to their special-needs twins and do not challenge that aspect of the juvenile court's decision. Instead, they argue the juvenile court erred in finding the other two children, K.B. and P.M., are deprived and terminating parental rights as to those children.

[¶ 10] A "deprived child" means a child who is "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of the child's parents, guardian, or other custodian." N.D.C.C. § 27–20–02(8)(a). We have said "proper parental care" means the parents' conduct in raising their children must satisfy "the minimum standard of care which the community will tolerate." *See Interest of R.S.*, 2010 ND 147, ¶ 8, 787 N.W.2d 277; *Inter-*

*est of K.R.A.G.,* 420 N.W.2d 325, 327 (N.D. 1988); *Interest of D.S.,* 325 N.W.2d 654, 659 (N.D.1982).

[¶ 11] "The definition of a deprived child is broad enough to encompass a child whose parent, while never having had the opportunity to care for the child, is shown to be presently incapable of providing proper parental care for the child." *Interest of T.J.O.,* 462 N.W.2d 631, 633 (N.D.1990); *see also Interest of E.R.,* 2004 ND 202, ¶ 6, 688 N.W.2d 384 (deprived child definition is broad enough to encompass child whose parent is presently incapable of providing proper parental care); *Interest of T.F.,* 2004 ND 126, ¶ 11, 681 N.W.2d 786 (same). A child may be found deprived despite having received adequate care from sources other than the parent. *Interest of R.S.,* 2010 ND 147, ¶ 8, 787 N.W.2d 277; *Interest of T.J.O.,* 462 N.W.2d at 633; *Interest of K.P.,* 267 N.W.2d 1, 4 (N.D.1978).

> Prognostic evidence may be relied upon to find that a child is a deprived child if it shows that the parent, although not having custody of the child, *would be presently unable to supply physical and emotional care for the child,* with the aid of available social agencies, if necessary, and that the inability would continue for sufficient time to render improbable the successful assimilation of the child into a family if that parent's rights were not presently terminated. *In Interest of J.A.L.,* 432 N.W.2d 876 (N.D.1988).

*Interest of T.J.O.,* 462 N.W.2d at 633 (emphasis added).

[¶ 12] We have further said that "[p]rognostic evidence must also demonstrate the parent's 'inability to care for the child would continue for sufficient time to render improbable the successful assimilation of the child into a family if that parent's rights were not presently terminated.'" *Interest of A.S.,* 2007 ND 83, ¶ 19,

733 N.W.2d 232 (quoting *Interest of L.F.,* 1998 ND 129, ¶ 17, 580 N.W.2d 573). "Evidence of the parent's background, including previous incidents of abuse and deprivation, may be considered in determining whether deprivation is likely to continue. Evidence of past or present deprivation, however, is not alone sufficient to terminate parental rights, rather there must be prognostic evidence." *Interest of L.F.,* at ¶ 16 (citations omitted). Lack of parental cooperation is relevant to whether deprivation will continue. *Id.* at ¶ 17. "'Prognostic evidence includes the reports and opinions of the professionals involved.'" *Interest of A.S.,* at ¶ 19 (quoting *Interest of D.F.G.,* 1999 ND 216, ¶ 20, 602 N.W.2d 697).

[¶ 13] Generally, "[a]n order finding a child deprived and temporarily transferring custody of the child is not res judicata for purposes of determining whether the child is a deprived child in [subsequent] proceedings to terminate parental rights." *Interest of K.S.,* 2002 ND 164, ¶ 9, 652 N.W.2d 341. "[D]ue process and notice requirements prohibit the juvenile court from taking judicial notice of testimony in proceedings where termination was not an issue." *Id.* However, "a juvenile court need not operate in a vacuum and may take judicial notice of orders in other proceedings." *Interest of T.T.,* 2004 ND 138, ¶ 10, 681 N.W.2d 779. *See Interest of K.S.,* at ¶ 9 ("Although a court can take judicial notice of its prior orders, the result of [a temporary custody proceeding], standing alone, is not sufficient to constitute clear and convincing evidence of deprivation" to terminate parental rights.).

### A

[¶ 14] N.M. and M.M. argue the State failed to meet its burden of proving

by clear and convincing evidence that K.B. and P.M. are deprived.

[¶ 15] The parents contend that, although the juvenile court found K.B. was a deprived child in May 2009, the factual basis for that initial adjudication has abated and K.B. is not now deprived. The parents also contend that since P.M. was born after the initial termination petition was filed, P.M. has not been previously adjudicated deprived and is not now a deprived child. While we understand N.M. and M.M.'s desire to limit the impact of evidence regarding the level of parental care given to all their children, the juvenile court in this case considered the environment in which the children were being raised to find the children are deprived, including the circumstances surrounding W.M.'s injuries.

[¶ 16] "[T]he primary purpose of N.D.C.C. ch. 27–20 is to protect the welfare of children," *Interest of A.M.*, 1999 ND 195, ¶ 6, 601 N.W.2d 253, and "[a] termination proceeding is preventive as well as remedial." *Waagen v. R.J.B.*, 248 N.W.2d 815, 819 (N.D.1976). This Court has held that all children in a particular home environment may be found deprived, despite varying degrees of deprivation among the children. *See Asendorf v. M.S.S.*, 342 N.W.2d 203, 207 (N.D.1983); *Interest of R.H.*, 262 N.W.2d 719, 725 (N.D.1978). "The fact that all [children] did not display the same symptoms of ailments and maladjustment does not preclude a finding of deprivation as to all" because "[a]ll [are] being raised in essentially the same environment." *Interest of R.H.*, 262 N.W.2d at 725. This Court has also held a court "need not await the happening of a tragic event" to protect a child, *Interest of T.K.*, 2001 ND 127, ¶ 17, 630 N.W.2d 38, particularly when a sibling has been found to be deprived. *See Interest of A.M.A.*, 439 N.W.2d 535, 539 (N.D.1989) (affirming deprivation finding and termination to three children where two older children showed signs of abuse); *Sexton v. J.E.H.*, 355 N.W.2d 828, 832 (N.D.1984) (affirming termination to two children and stating the baby was in potentially greater danger because the older child could run away from a situation, but "the baby is defenseless"); *see also* N.D.C.C. § 27–20–02(3)(d)(1) (defining "aggravated circumstances" for purposes of termination under N.D.C.C. § 27–20–44(1)(b) to include circumstances where the victim is another child of the parent).

[¶ 17] Other courts have held that "abuse of one child is relevant to the care a parent will provide to other siblings." *In re L.B.*, 416 N.W.2d 598, 599 (S.D.1987); *see Interest of D.L.R.*, 638 P.2d 39, 42 (Colo.1981) ("[A] trial court may properly consider the treatment accorded other children in determining whether the child before it is neglected and dependent."); *In re T.Y.K.*, 183 Mont. 91, 598 P.2d 593, 595 (1979) ("The more enlightened majority rule appears to be that a parent does not have the privilege of inflicting brutal treatment upon each of his children in succession before they may individually obtain the protection of the state."); *In re D.G.N.*, 691 S.W.2d 909, 911–12 (Mo.1985) ("The past abuse of another sibling is evidence of a home environment that is currently dangerous to the child for whom termination is sought."); *In re J.K.*, 38 S.W.3d 495, 503 (Mo.Ct.App.2001) ("Missouri law 'clearly allows for the termination of parental rights where a sibling has been abused.'"); *In re K.D.E.*, 87 S.D. 501, 210 N.W.2d 907, 910 (1973) ("Where the trial court has determined that neglect or abuse exists in regard to one child, it is within its discretion to determine the likelihood of abuse of other children in the same family. If such is likely to exist, then the court has the right to terminate

any parental ties."); *see also In re T.K.,* 105 Conn.App. 502, 939 A.2d 9, 15 (2008) ("The *doctrine of predictive neglect* is grounded in the state's responsibility to avoid harm to the well-being of a child, not to repair it after a tragedy has occurred." (emphasis added)); *In re Michael D.,* 58 Conn.App. 119, 752 A.2d 1135, 1138 (2000) ("An adjudication of neglect may be based on a potential risk of harm and not just actual harm."). *Cf. In re K.B.,* 737 So.2d 150, 153 (La.Ct.App.1999) (shaken baby victim's siblings adjudicated in need of care based on finding under statute that mother's conduct constituted crime against any other child of that parent); *see generally* Karen S. Kassebaum, *The Siblings of Abused Children: Must They Suffer Harm Before Removal From The Home?,* 29 Creighton L.Rev. 1547, 1557 (1996) ("While most appellate courts have upheld a trial or juvenile court's adjudication of the siblings of an abused child, some appellate courts have gone further and allowed the termination of parental rights to the siblings based upon the evidence of abuse to other children.").

[¶ 18] N.M. and M.M. assert that the deprivation has abated, in part because they relinquished parental rights to W.M. and J.M. *Cf. Interest of B.M.,* 335 N.W.2d 321, 323 (N.D.1983) (deprivation caused by unlawful placement of child for adoption abated when placement was revoked). While the degree of deprivation among the children may have varied, we reject N.M. and M.M.'s assertion that, by stipulating to terminate their parental rights to W.M. and J.M. at the beginning of trial, the trial testimony and evidence was limited only to their ability to provide "proper parental care" to K.B. and P.M.

## B

[¶ 19] N.M. argues the evidence does not support deprivation based on the injury to W.M. on November 14, 2008. N.M. claims the inference that either N.M. or M.M. perpetrated W.M.'s trauma is not supported by clear and convincing evidence and the evidence fails to establish probable cause sufficient to support criminal proceedings, because neither parent has been arrested or charged with a crime.

[¶ 20] Here, the juvenile court noted the parents' prior stipulation to deprivation, but also made post-trial findings establishing W.M.'s injuries were non-accidental and consistent with shaken baby syndrome. There is testimony supporting the juvenile court's findings. Dr. Janet Tillisch, a pediatrician with thirty-one years of experience, testified she treated W.M. when he was brought to the hospital and W.M.'s injuries were consistent with shaken baby syndrome. Dr. Tillisch opined that based on the presence of retinal hemorrhages and too much bleeding in the brain, N.M.'s explanation was inconsistent with W.M.'s injuries.

[¶ 21] Dr. Scott Mutchler, a pediatric critical physician and director of the neonatal intensive care unit, testified he had treated W.M. and J.M. from birth. Dr. Mutchler also opined W.M.'s injury was non-accidental and W.M.'s injuries were not consistent with the parents' explanation. Dr. Mutchler testified that even if a prior injury had existed, the parents' explanation was not plausible. Dr. Mutchler testified W.M. had bleeding in his head and in his eyes, consistent with shaken baby syndrome. Dr. Mutchler opined W.M. sustained a very significant shaking injury, and was near death before resuscitation. Dr. Mutchler testified he had spoken with the parents when he was brought onto the case, and they acknowledged they had been the only individuals caring for W.M. during the relevant time period. Dr. Mutchler opined that W.M. was shaken sometime during the day on November 14.

[¶ 22]   In response, N.M. and M.M. presented testimony from their expert, Dr. Matthew Roller, a neurologist, who testified it was possible W.M. suffered two separate injuries, with one subdural hematoma suffered three to thirty days before the November 14 injury. Dr. Roller testified that an earlier injury appeared to be consistent with shaken baby syndrome, but that a second injury could have resulted from a lower level of trauma, rendering the parents' explanation plausible.   Dr. Roller also testified regarding a possible subsequent injury, a cranial bleed in May 2009, that would have occurred while W.M. was in the custody and care of social service.   The parents argue that testimony "lends credibility" to their explanation. However, the juvenile court specifically considered Dr. Roller's testimony and rejected the parents' contention, emphasizing instead that Dr. Roller also testified the most likely explanation for W.M.'s November 14 injury was non-accidental trauma.

■■■   [¶ 23]   Although N.M. and M.M. contend there was "alleged" non-accidental trauma to W.M. and neither parent had been arrested or charged with a crime for the injury, the parents had stipulated in May 2009 to the deprivation of K.B., W.M., and J.M., based on a petition which included allegations that M.M. had been the only adult in the home when W.M. went into distress, that N.M. had left the home shortly before W.M. went into distress, and that medical professionals determined W.M.'s injuries were consistent with shaken baby syndrome, sustained less than three days prior and likely within 24 hours.   "Although a court can take judicial notice of its prior orders, the result of the . . . temporary custody proceeding, standing alone, is not sufficient to constitute clear and convincing evidence of deprivation" to terminate parental rights.   *Inter-*

*est of K.S.,* 2002 ND 164, ¶ 9, 652 N.W.2d 341.   However, in this case, the testimony of the various medical professionals at trial supports the juvenile court's post-trial findings regarding W.M.'s injuries.

[¶ 24]   Based on our review of the record, we are not left with a definite and firm conviction a mistake has been made and conclude the juvenile court did not clearly err in finding deprivation of the children, based in part on W.M.'s injuries as a result of shaken baby syndrome sustained while in the care of the parents.

C

■■   [¶ 25]   N.M. and M.M. also argue the juvenile court's finding that K.B. and P.M. are deprived children based on parental deficits is unsupported by the evidence.

[¶ 26]   The parents contend the evidence established that following the initial adjudication of the children as deprived, they participated in on-going medical appointments for the children, completed a parental capacity evaluation and a parent training course, and participated in individual therapy and parent aide services and visitations.   The parents assert the evidence showed that, following P.M.'s birth and the child's subsequent placement into shelter care, the parents worked to establish a working nurturing parent-child bond with the children and continued to demonstrate the ability to provide the children with appropriate care.   The parents challenge the juvenile court's reliance on "uncorroborated assertions" of a Cass County parenting aide.   They argue "the weight of her testimony" shows that the children had not been harmed, and the parents "substantially" cooperated with the parent aide, demonstrating a competent level of "proper parental care" consistent with minimum standards of care which the community will tolerate.

[¶ 27] "We are sensitive to the argument that it is dangerous to allow the judgment of social workers to determine how a family is run." *Bjerke v. D.T.*, 248 N.W.2d 808, 814 (N.D.1976). Yet, "a parent's lack of cooperation with social service agencies indicates the causes and conditions of deprivation are likely to continue or will not be remedied." *Interest of A.B.*, 2010 ND 249, ¶ 22, 792 N.W.2d 539.

[¶ 28] In this case, in addition to findings about W.M.'s non-accidental injuries, the juvenile court made detailed findings illustrating the conditions and concerns regarding the parents, including their inability to grasp and apply basic parenting skills, their failure to keep up with developmental changes in the children, and their failures regarding safety and meeting the children's physical needs. The court also found the parents' health concerns negatively contributed to the deprivation or continuing deprivation. The court specifically found that P.M. is "extremely vulnerable" because of his young age and that K.B. and P.M. would be raised in essentially the same harmful environment.

[¶ 29] Bill Willis, a licensed social worker and Cass County Social Services case manager, testified the primary goal was reunification, but the parents had been unable to assure the safety of the children and address the issues that prompted the removal of the children from the home in the first place. Willis testified the case plan he developed with N.M. and M.M. was designed to address the problems he observed, including parenting deficits and the parents' need for therapy. Willis testified that N.M. and M.M. were unable to grasp the special needs of the children and that N.M. is unable to parent alone, regardless of how many children are in her care since all she can focus on is her own needs, her medications, and her pain. Willis testified that nothing had improved.

[¶ 30] Dr. Krislea Wegner, a clinical psychologist, testified that N.M. was given a parental capacity evaluation. Dr. Wegner diagnosed N.M. with "Anxiety Disorder, Not Otherwise Specified," and "Adjustment Disorder, with Depressed Mood, Chronic." Dr. Wegner opined that N.M.'s mental health issues were compromising her situation, and she had long standing anxiety, which was more expansive and which was not treated or insufficiently treated. Dr. Wegner also performed a parental capacity evaluation of M.M. Dr. Wegner noted that M.M. had a long history of experiencing symptoms of impulsivity and anxiety. Dr. Wegner diagnosed M.M. with "Generalized Anxiety Disorder, with Panic Attacks," and "Adjustment Disorder, with Mixed Anxiety and Depressed Mood, Chronic." Dr. Wegner testified, with regard to prognosis, that a client who participates and is successful in improving has the best prognosis and that performance with regard to choices and actions are key to determining whether there is improvement. There is evidence the parents' participation in therapy was inconsistent and incomplete at the time of trial.

[¶ 31] Dr. Barb Stanton, a child and family therapist and clinical supervisor, testified that she reviewed N.M.'s file when assigning another therapist to treat N.M. Dr. Stanton noted a concern with N.M.'s follow-through with prior appointments, because of a 50% no show or cancellation rate. Dr. Stanton assigned N.M.'s case to Amanda Haire, a master's level clinical intern at Southeast Human Services. Haire testified she had her first contact with N.M. in February 2010. Haire testified N.M. was not consistent with expectations of therapy and had several weeks of "no shows" and missed appointments. While indicating to Haire that she would like to continue therapy, N.M. attended only seven sessions and

discontinued treatment in May 2010. Haire made over 18 phone calls to N.M., but the calls did not increase attendance. Haire testified there had been inconsistent attendance, and consistent sessions would be helpful, because consistent therapy gives a client "traction," and attendance might be an indicator of progress. Haire testified that while some progress was made in the identification and regulation of emotions, parenting skills had not been part of therapy.

[¶ 32] Tanya Fraizer, a Cass County Social Services parent aide, testified that she provided visitation supervision and parent education to N.M. and M.M., including direct instruction of skills, reflective teaching, modeling, providing cues during visitation, watching videos of interactions, providing handouts and written materials, and providing interventions. Fraizer testified N.M. and M.M. had attended approximately 67 of the 72 visitations available and approximately 28 of the 54 parenting education sessions available. Although N.M. and M.M. attended visitations, almost half of the parenting education sessions did not occur despite efforts to accommodate the parents.

[¶ 33] Fraizer testified that goals were identified in working with the family, including safety, preparedness for visits, stress management during visits, development of time management skills, development and implementation of problem solving skills, following-up on recommendations by doctors and therapists for the children, development of consistency with responding to children's cues for care, development and maintenance of a routine, implementation of consistent, appropriate discipline for the children, meeting the children's physical needs, and meeting the parents' physical and mental health needs. Fraizer testified neither N.M. nor M.M. met these goals. Fraizer testified

N.M. and M.M. had been unable to prepare for visiting the children, even when the visits take place in their home, did not have certain basic items for the children, and had not "child-proofed" the home to keep the children safe. Fraizer testified that N.M. and M.M. have been unable to develop communication skills, and N.M. primarily relied on "time-outs" for herself, leaving the children unattended or in the care of the parent aide.

[¶ 34] Based on our review of the record, we are not left with a firm and definite conviction the juvenile court made a mistake in finding K.B. and P.M. are deprived children based in part on the parents' parental deficits, coupled with the prior finding regarding W.M.'s injuries.

### D

[¶ 35] N.M. and M.M. assert that the juvenile court failed to give them "a full measure" concerning their parental abilities and efforts to provide appropriate care for the children, two of whom have special needs. The parents contend that the court failed to consider the extraordinary circumstances for the special-needs twins and that the parents had allowed for the twins to be adopted so they could dedicate their parental attention and resources to providing appropriate care for the remaining children, K.B. and P.M.

[¶ 36] Indeed, it is clearly established that "the special needs of children are relevant to a determination of whether there will be continuing or unremedied deprivation." *Interest of L.J.*, 436 N.W.2d 558, 561 (N.D.1989); *see also Jacobson v. V.S.*, 271 N.W.2d 562, 569 (N.D. 1978); *Bjerke v. D.T.*, 248 N.W.2d 808, 813 (N.D.1976). This Court has indicated a "fluctuating" standard for determining parental care for special-needs children:

It can hardly be questioned that some children require more care and attention

and skill in the art of parenting than do others. The requisite care and control called for by a minimum standard of parenting must necessarily fluctuate with the kind of children being parented. There is no absolute standard. In the case of the special-needs-child, the minimum care that a community will tolerate must necessarily include not only providing basic necessities of food, shelter, and clothing, but also providing the quantum of supervision, supportive education and nurture that will permit the child's reasonable development given the child's reasonable potential. A parent is not expected to do more than to provide the care and control necessary under the circumstances. When a child's potential is limited, so is the leeway of a parent to meet minimum standards.

*Interest of L.J.*, 436 N.W.2d at 561. However, a parent's actual treatment of a special-needs child may still be relevant to the level of parental care for another child. *See In re William B.*, 73 Md.App. 68, 533 A.2d 16, 21 (Md.Ct.Spec.App.1987). In *William B.*, at 21, the court held "the differences between the children [did] not negate the reasonableness of an inference that the parents' inability to care for [the special-needs child] is evidence of an inability to care for [a sibling]," and stated "[t]he unmet needs of [the special-needs child] were not extraordinary ones requiring any particular sophistication.... Rather, the deficiencies in care that were pointed out at the hearing [were] basic and fundamental ones." *Id.*

[¶ 37] In essence, N.M. and M.M. argue that by giving up parental rights to the special-needs twins, they are presently capable of providing proper parental care and control to K.B. and P.M. The parents' argument implicitly suggests the special-needs children were the primary cause of the deprivation. However,

the juvenile court findings, supported by the evidence, do not support their claim. N.M. and M.M. may not pick and choose which children for whom they are able to provide parental care when the juvenile court found all the children were deprived. The record contains evidence that K.B. and P.M. are without "proper parental care" and are deprived, despite receiving adequate care from sources other than the parent. "[W]hen the mental and physical health of a child are the concerns, it is not enough that a [parent] indicate a desire to improve. A parent must be able to demonstrate present capability, or capability within the near future, to be an adequate parent." *Interest of D.M.*, 2007 ND 62, ¶ 22, 730 N.W.2d 604 (quoting *Interest of M.D.K.*, 447 N.W.2d 318, 322 (N.D.1989)).

[¶ 38] Because we are not left with a firm and definite conviction that a mistake has been made, we conclude the juvenile court did not err in finding K.B. and P.M. are deprived and therefore did not err in adopting the referee's order terminating N.M. and M.M.'s parental rights.

## IV

[¶ 39] The juvenile court order is affirmed.

[¶ 40] CAROL RONNING KAPSNER, DANIEL J. CROTHERS, DALE V. SANDSTROM, and MARY MUEHLEN MARING, JJ., concur.