2009 ND 116

**In the Interest of A.B., a child**

**Wanda Larson, Dickey County Director of Social Services, Petitioner and Appellee**

v.

**A.H., mother, Respondent and Appellant**

and

**A.B., child, and unknown father of the above-named child, Respondents.**

No. 20080256.

Supreme Court of North Dakota.

July 9, 2009.

Gary D. Neuharth, State's Attorney, Oakes, ND, for petitioner and appellee; submitted on brief.

Joel L. Larson (argued), Grand Forks, ND, for respondent and appellant.

MARING, Justice.

[¶ 1] A.H. ("Amy")[1] appeals from a juvenile court's order terminating her parental rights to her child, A.B. ("Allison"). We affirm, holding the juvenile court did not err in terminating her parental rights because the State proved by clear and convincing evidence that the deprivation of Allison was likely to continue, Allison would likely suffer harm without termination of Amy's parental rights, and reasonable efforts were made to reunify the family.

I

[¶ 2] Allison was born on December 25, 2006. Her biological mother is Amy, and her biological father is unknown. Child Protection Services referred Allison to Dickey County Social Services in July 2007 for case management services stemming from concerns Allison was not receiving proper nutrition and was sleeping in a single bed at six months of age. Case management services began on July 25, 2007. A social worker for Social Services reported that Allison was not receiving proper nutrition, Amy was mixing Allison's formula incorrectly, giving her juice and pop, and feeding her unblended hot dogs, chicken, and sausage, although Allison did not have any teeth. The social worker noted concerns that Amy unreasonably expected Allison to understand the concept of "no," used a harsh tone with Allison, and berated Allison for crying.

[¶ 3] Amy informed a health care professional that Allison suffered a concussion when Amy set her on a sidewalk. She also disclosed to a social worker that she left Allison alone in the apartment when she went across the street to do laundry. Amy told a social worker that Allison woke up between 6:00 a.m. and 6:30 a.m., Amy programmed the television to come on at that time so Allison could watch television, and Amy remained in bed while Allison was left unattended. Amy also informed a social worker that she had given birth to another child in Minnesota and later consented to the adoption of that child. Amy reported that her boyfriend had been in prison for burglary, had a history of using and selling drugs, and had threatened to shoot her first child. Amy admitted she had a history of violence with adult family members and had gone to jail for a physical altercation with her first child's aunt.

[¶ 4] A health care professional contacted Social Services on August 9, 2007, stating Allison's weight compared to length was at the 7.8 percentile on the growth chart and she was very thin for her

---

1. The parties' names are pseudonyms.

height. On September 28, 2007, another health care professional reported Allison had not gained any weight in three and one-half weeks. The health care professional expressed concerns that Amy was feeding Allison fruit snacks and suckers instead of baby food.

[¶ 5] On October 1, 2007, Social Services received a report that Amy was leaving Allison alone in her apartment, not providing appropriate clothing for Allison, feeding her chicken and chips when she had no teeth, spanking her when she did not listen, and picking her up by the arms. On October 8, 2007, and October 15, 2007, case workers advised Amy that Allison's car seat should be rear-facing, but Amy did not comply with the case workers' requests to install Allison's car seat so it was rear-facing. On October 23, 2007, a health care professional informed Social Services that Amy would not accept advice pertaining to Allison's nutritional needs. The health care professional reported that Amy wanted to feed Allison puff corn and Cheez–Its rather than fruits and vegetables. A third party also expressed concerns that Allison was not being fed and that Amy gave Allison sports drinks, pop, chicken, and chips, although she had few, if any, teeth.

[¶ 6] On November 6, 2007, Social Services received a child protection report, expressing concerns that Allison was often underdressed for weather conditions, Amy referred to her as a brat, and Amy left Allison with an unsafe caregiver. Another child protection report was received on November 29, 2007, stating a third party had witnessed Amy hit Allison on the back of the head, putting her at serious risk of injury.

[¶ 7] The juvenile court issued a temporary custody order on November 29, 2007, and Allison was placed in foster care. The court held a deprivation hearing on January 29, 2008, and found Allison to be a deprived child.

[¶ 8] Amy was evaluated by a psychologist in January 2008. The psychologist concluded Amy's expectations exceeded the developmental capabilities of her child, her self-concept as a parent was likely to be easily threatened, and she may be demanding and controlling as a parent. He explained Amy was likely to place her own needs before those of others, had significant problems with authority, and was dependent on men. The psychologist also concluded:

> [Amy] endorsed being attached to her daughter; however, the relationship is not a very close one. The daily demands and restrictions that parenthood places upon the personal freedom of parents appear to be readily accepted by this parent. [Amy] is lacking in confidence with regard to child developmental expectations and child management skills. Problems in consistency of approach to the child are likely to exist. The absence of a strong support system represents a major stressor for this parent. She endorsed feeling supported by and having a positive relationship with her partner.

> Finally, [Amy] reported having experienced a number of life stressors from outside her parent-child relationship. The impact of these stressors may divert her attention from her parenting responsibilities. These factors are likely to add to her overall burden and may increase the likelihood of dysfunctional parenting.

The psychologist summarized, "Overall, the testing, clinical interview, and record review, provide data that suggests that many of [Amy's] parenting and interpersonal difficulties are associated with her inflexible and pervasive personality charac-

teristics. Prognosis for change in these areas is very guarded."

[¶ 9] Amy met with the psychologist, Social Services director, and a parent aide on February 8, 2008. The psychologist informed Amy that he wanted her to participate in counseling, work on parenting skills, and be open to parent aide suggestions.

[¶ 10] Amy met with a parent aide and a parenting class instructor on March 18, 2008. The parenting class instructor explained that Amy had the option of using a parenting curriculum with a spiritual focus. Amy selected the curriculum with a spiritual focus and signed a form with that request. Amy also attended a permanency planning meeting on March 19, 2008, where staff discussed concerns that Amy needed to focus on anger management.

[¶ 11] Amy began meeting with a therapist in February 2008 and continued meeting with the therapist until the termination of parental rights hearing. After Allison was removed from Amy's home, Amy attended thirty-six supervised visits with Allison. Caseworkers reported Amy used harsh tones with Allison, called Allison names when she became angry, and refused to attend anger management classes. Amy attended four of twenty-four parenting classes. She claimed she did not feel comfortable working with the parenting class instructor.

[¶ 12] Dickey County Social Services petitioned to terminate Amy's parental rights on June 24, 2008, alleging Allison was a deprived child, deprivation was likely to continue, and although services had been provided to Amy, she had not followed the recommendations and had not made significant changes toward providing a safe, appropriate, and stable home for Allison. Amy requested a court-appointed attorney, and the juvenile court ordered the matter be continued for sixty days.

[¶ 13] The guardian ad litem filed a report on September 3, 2008, concluding Amy was very resistant to working with the individuals and programs available to her, did not comply in a cooperative manner consistently enough so positive parenting changes could take place, and was unable to control her own oppositional behavior even though she was aware that it would have been in Allison's best interests. The guardian ad litem recommended termination of Amy's parental rights.

[¶ 14] The juvenile court held a termination of parental rights hearing on September 30, 2008. The court concluded Allison was a deprived child because Amy disregarded her physical safety and her emotional, basic, nutritional, and developmental needs. The court found Amy rejected the recommendations and instructions of professionals, continued relationships with men with histories of domestic violence, drug use, and sex offenses, and did not recognize the negative impacts on Allison. The court found Amy missed twenty of twenty-four scheduled parenting classes, made minimal progress over seven months of counseling, and Allison had been in foster care for almost half her life. The court found the State had made reasonable efforts to reunify the family through parent aide services, a single plan of care, family focused case management, public health nursing services, Women, Infants, and Children Services, nutritional services, psychological evaluations, counseling, and anger management. The court found deprivation was likely to continue because Amy was not amenable to treatment, put her own needs ahead of Allison's, and refused services from professionals. The court also found Amy was diagnosed with a personality disorder that was not easily treated and it was extremely unlikely that her behaviors as a parent would

change. The court found Amy's anger and aggression placed Allison at risk physically and emotionally, Amy did not see herself as having any problems, and would not accept responsibility for her behavior. The court concluded it was in the best interests of Allison that Amy's parental rights be terminated.

[¶ 15] Amy appeals, arguing the juvenile court erred in concluding there was clear and convincing evidence to support a finding that deprivation was likely to continue, Allison would likely suffer harm without termination of Amy's parental rights, and reasonable efforts were made to reunify the family. Amy does not dispute that Allison is a deprived child.

## II

[¶ 16] A juvenile court may terminate a parent's rights to a child if: (1) the child is a deprived child; (2) the conditions and causes of deprivation are likely to continue or will not be remedied; and (3) the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm. N.D.C.C. § 27–20–44(1)(b). The petitioner seeking termination of parental rights must prove these elements by clear and convincing evidence. *Interest of M.B.*, 2006 ND 19, ¶ 13, 709 N.W.2d 11. "Clear and convincing evidence means evidence that leads to a firm belief or conviction the allegations are true." *Id.* On appeal, we give due regard to the juvenile court's opportunity to judge the credibility of the witnesses, and we will not reverse a juvenile court's findings of fact unless they are clearly erroneous. *Interest of J.S.L.*, 2009 ND 43, ¶ 12, 763 N.W.2d 783. "A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if no evidence exists to support the finding, or if, on the entire record, we are left with a definite and firm conviction a mistake has been made." *In-*

*terest of M.B.*, 2006 ND 19, ¶ 13, 709 N.W.2d 11.

## III

[¶ 17] Amy argues the juvenile court clearly erred in finding there was clear and convincing evidence that deprivation of Allison was likely to continue. She asserts that many of the State's initial concerns are no longer valid because Allison no longer needs to sleep in a crib and is now able to eat foods that were initially a concern. Amy also contends she has followed through on most of Social Services' recommendations and will continue to do so in the future.

[¶ 18] "In determining whether the causes and conditions of deprivation will continue or will not be remedied, evidence of past deprivation alone is not enough, and there must be prognostic evidence that forms the basis for reasonable prediction of continued or future deprivation." *Interest of E.R.*, 2004 ND 202, ¶ 7, 688 N.W.2d 384. Prognostic evidence is "evidence that forms the basis of reasonable prediction as to future behavior." *Interest of D.R.*, 2001 ND 183, ¶ 11, 636 N.W.2d 412. "[A] pattern of parental conduct can form a basis for a reasonable prediction of future behavior." *In re B.B.*, 2008 ND 51, ¶ 9, 746 N.W.2d 411. "[E]vidence of the parent's background, including previous incidents of abuse and deprivation, may be considered in determining whether deprivation is likely to continue." *Id.* Furthermore, "[a] lack of parental cooperation with social service agencies is pertinent to determining if deprivation will continue." *In re A.K.*, 2005 ND APP 3, ¶ 8, 696 N.W.2d 160.

[¶ 19] The record indicates that at the time of the termination proceeding, Amy had not even begun to address the issues underlying and causing Allison's deprivation. The record is replete with evidence

to support the juvenile court's findings that Amy ignored Allison's needs, did not recognize the negative impact she had on Allison's life, continued relationships with dangerous men, refused to follow Social Services' recommendations, rejected services that were offered to her, only attended four of twenty-four parenting classes, and made only minimal progress over seven months of individual counseling. Likewise, evidence in Amy's background also serves as a reasonable indicator that deprivation is likely to continue. The record indicates Amy exposed her first child to known sex offenders and violent relationships. Amy continued that behavior by exposing Allison to her unstable relationship with a convicted drug dealer. In 2004, Social Services found that Amy did not understand how to meet her first child's needs, did not possess parenting skills to provide for the child's safety and development, placed her own needs above her child, and berated and called her child names. The psychologist testified that Amy still has those same issues in regard to her parenting of Allison. He believed that her past parenting served as a good predictor of her future behavior, and he was very concerned about whether Amy's behavior would ever change. The record establishes that Amy does not have the willingness or ability to change her behavior. Therefore, the juvenile court did not err in concluding there was clear and convincing evidence that Allison will continue to be deprived if returned to Amy's care.

IV

[¶ 20] Amy argues the juvenile court clearly erred in finding there was clear and convincing evidence that the child would likely suffer harm without termination of parental rights. Amy argues she has made great strides in preparing a new home for Allison, has discontinued her relationship with a sex offender, has been regularly attending and progressing in therapy, and there was no evidence presented that Amy's current boyfriend had ever harmed Allison.

[¶ 21] "Upon a showing that a child's deprivation is likely to continue in an action to terminate parental rights, it must be shown that the child is suffering or will probably suffer some serious physical, mental, moral, or emotional harm." *Interest of J.S.L.*, 2009 ND 43, ¶ 33, 763 N.W.2d 783 (citing N.D.C.C. § 27–20–44(1)(c)(1)). "The probability of serious mental and emotional harm to a child may be established by prognostic evidence that a parent's current inability to properly care for the child will continue long enough to render improbable the successful assimilation of the child into a family if the parent's rights are not terminated." *Id.* "The risk of future harm may be based on evidence of previous harm." *In re J.S.*, 2008 ND 9, ¶ 17, 743 N.W.2d 808.

[¶ 22] The record supports the juvenile court's conclusion that Allison was suffering or will probably suffer serious physical, mental, moral, or emotional harm if returned to Amy's care because deprivation would likely continue. The court found that placing Allison in Amy's home would be contrary to Allison's welfare because Amy would be unable to meet her needs and Amy's anger and aggression placed Allison at risk physically and emotionally. The guardian ad litem testified that Allison would not be safe if returned to Amy's care, and Amy had a low tolerance for anger and frustration. The guardian ad litem also testified Amy remained combative and oppositional to social workers and had not made progress or given a consistent effort to improving her parenting skills. A social worker testified that Amy used harsh tones with Allison, called Allison names when she became angry, yelled

at Allison when she needed to be fed, placed her in unsafe situations, and did not understand her needs. Amy's therapist testified Amy made only minimal progress on her anger management problems. The psychologist testified Amy maintained relationships with individuals with criminal backgrounds, and Amy's focus on herself could make it difficult to raise Allison. Based on this evidence, we conclude the juvenile court's conclusion that Allison would suffer physical, mental, moral, or emotional harm if returned to Amy's care was supported by clear and convincing evidence and was not clearly erroneous.

[¶ 23] Amy also argues she should be permitted an additional twelve-month period to prove she is capable of being a good parent. She contends that Allison is only two years of age and will not be harmed by twelve additional months of foster care. However, we have held that "long term and intensive treatment is not mandated if it cannot be successfully undertaken in a time frame that would enable the child to return to the parental home without causing severe dislocation from emotional attachments formed during long-term foster care." *Interest of J.L.D.*, 539 N.W.2d 73, 77 (N.D.1995) (citation omitted). As we further explained, there are "grave problems implicit in making a deprived child assume the risks of waiting to see if a parent can turn his or her life around to become adequate for the parental role." *Id.* The juvenile court found Allison had lived almost half her life in foster care and was in need of permanency. This finding was supported by the guardian ad litem's testimony that she did not think Allison could wait an additional year for Amy to change her behavior, and Amy had not made a consistent effort in parenting Allison. Similarly, Amy's therapist testified that Amy had made only minimal progress over nine months of therapy, had not been compliant with therapy in the past, and

would need months or years of additional therapy to be prepared to parent Allison. Furthermore, the psychologist testified Amy was not motivated to change, blamed others, and had an oppositional attitude toward the social workers who were trying to help her. The psychologist also testified that Amy had a personality disorder, which caused her to be resistant to change and made it difficult for her to progress as a parent. Because Allison should not be forced to "remain in this indeterminate status midway between foster care and the obvious need for permanent placement," *see Interest of B.N.*, 2003 ND 68, ¶ 25, 660 N.W.2d 610 (citation omitted), we conclude the juvenile court did not clearly err in finding the State had shown by clear and convincing evidence that Allison needed permanency, Amy was not amenable to treatment, and it was extremely unlikely that Amy's behaviors as a parent would change.

### V

[¶ 24] Amy argues the juvenile court clearly erred in finding by clear and convincing evidence that the State made reasonable efforts to reunify the family once the child was removed. Specifically, Amy argues the State did not provide her appropriate parenting classes because the instructor lacked the proper training to teach the classes and Amy was uncomfortable by the religious nature of the classes. Amy contends the State should have provided her transportation so she could attend parenting classes in another city because she did not benefit from her individual parenting classes.

[¶ 25] Section 27–20–32.2(2), N.D.C.C., provides that "reasonable efforts must be made to preserve and reunify families." Section 27–20–32.2(1), N.D.C.C., defines reasonable efforts as:

[T]he exercise of due diligence, by the agency granted authority over the child ... to use appropriate and available services to meet the needs of the child and the child's family in order to prevent removal of the child from the child's family or, after removal, to use appropriate and available services to eliminate the need for removal and to reunite the child and the child's family. In determining reasonable efforts to be made with respect to a child ... and in making reasonable efforts, the child's health and safety must be the paramount concern.

The State is not required to "exhaust every potential solution" before seeking termination of parental rights. *In re J.S.*, 2008 ND 9, ¶ 19, 743 N.W.2d 808. The State is not required to provide long-term and intensive treatment to assist Amy in establishing an adequate environment for Allison if it cannot be undertaken in a reasonable time frame. *See Interest of E.R.*, 2004 ND 202, ¶ 11, 688 N.W.2d 384.

[¶ 26] The record supports the juvenile court's conclusion that the State has shown by clear and convincing evidence that it made reasonable efforts to reunite the family. The record indicates the State provided Amy parent aide services, a single plan of care with goals and objectives, family-focused case management, parental capacity evaluations, individual counseling, anger management therapy, psychological evaluations, public health nursing and nutritional services, and parenting classes. Amy claims she was not provided appropriate parenting classes because the classes contained a religious component. However, the evidence in the record indicates Amy met with a parent aide and parenting class instructor in March 2008. The parenting class instructor explained that Amy had the option of using a parenting curriculum with a spiritual focus. Amy selected the curriculum with a spiritual

focus and signed a form with that request. When Amy expressed her dissatisfaction with the spiritual element, the classes were modified. Despite the modification, Amy only attended four of twenty-four parenting classes. The record establishes that the State provided appropriate and available services to Amy, many of which she declined to accept. We conclude the juvenile court did not clearly err in finding that there was clear and convincing evidence that the State made reasonable efforts to reunify Amy and Allison.

## VI

[¶ 27] We conclude the juvenile court did not err in terminating Amy's parental rights because the State proved by clear and convincing evidence that deprivation of Allison was likely to continue, Allison would likely suffer harm if Amy's parental rights were not terminated, and the State made reasonable efforts to reunify the family. Therefore, we affirm the juvenile court's order.

[¶ 28] GERALD W. VANDE WALLE, C.J., DANIEL J. CROTHERS, DALE V. SANDSTROM, and CAROL RONNING KAPSNER, JJ., concur.