Filed 12/21/10 by Clerk of Supreme Court

IN THE SUPREME COURT

STATE OF NORTH DAKOTA

2010 ND 249

In the Interest of A.B., a/k/a A.B., a Child

-----------------

Kari Bitz, LSW, Petitioner and Appellee

v.

A.B., a/k/a A.B., Child; A.B., 

Legal Father; Barb Oliger, 

Guardian Ad Litem; and the 

Executive Director of Human Services 

Department, Respondents

-----------------

Vernon Thorson; Holly Thorson; 

Kevin Cramer; Kris Cramer; 

K.S., and Jane Richmond, Intervenors

-----------------

A.B., Legal Father,      Appellant

-----------------

Kevin Cramer and Kris Cramer,      Appellees

No. 20100351

In the Interest of A.B., a/k/a A.B., a Child

-----------------

Kari Bitz, LSW, Petitioner and Appellee

v.

A.B., a/k/a A.B., Child; A.B., 

Legal Father; K.S., Maternal Aunt; 

and the Guardian Ad Litem, Barb Oliger, Respondents

-----------------

Vernon Thorson; Holly Thorson; 

Kevin Cramer; Kris Cramer; 

and Jane Richmond, Intervenors

-----------------

A.B., Legal Father,      Appellant

-----------------

Kevin Cramer and Kris Cramer,      Appellees

No. 20100352

Appeal from the Juvenile Court of Burleigh County, South Central Judicial District, the Honorable Thomas J. Schneider, Judge.

AFFIRMED.

Opinion of the Court by Maring, Justice.

Jeffrey R. Ubben (argued), Assistant State’s Attorney, Courthouse, 514 E. Thayer Ave., Bismarck, N.D. 58501, for petitioner and appellee.

Edwin W.F. Dyer III (argued), P.O. Box 2261, Bismarck, N.D. 58502-2261, for appellant.

Todd D. Kranda, P.O. Box 1266, Mandan, N.D. 58554-7266, for appellees Kevin Cramer and Kris Cramer; submitted on brief.

In the Interest of A.B.

Nos. 20100351 & 20100352

Maring, Justice.

[¶1] A.P.B. (“father”) appeals from a juvenile court’s order affirming the orders of the Juvenile Referee finding A.B. (“child”) to be a deprived child and terminating the father’s parental rights to the child.  We affirm, holding the juvenile court did not err in finding the child was a deprived child and terminating the father’s parental rights.  We conclude the court’s findings that there is clear and convincing evidence the child was a deprived child, the deprivation was likely to continue, and the child would probably suffer harm without the termination of the father’s parental rights, are not clearly erroneous.

I

[¶2] The child was born on March 22, 2007.  The biological mother is J.B. (“mother”).  The father signed a voluntary paternity acknowledgment after the child was born, making him the child’s legal father.  The child’s biological father is unknown.  At the time of the child’s birth, the father was serving a sentence for an aggravated assault conviction at the James River Correctional Center in Jamestown, North Dakota.  For the first three months following the child’s birth, the father had weekly or biweekly visits with the child in prison.  The father did not see the child for the remainder of his incarceration.  On February 18, 2008, the father was released from prison. Shortly after his release, the father moved to Washington state where he currently resides with his girlfriend and their two young children.

[¶3] On March 12, 2010, the child witnessed the violent murder of his mother.  The child was subsequently placed in foster care for a day and was then released to the care and custody of his maternal grandmother.  However, as the grandmother was preparing to take the child to her permanent home in Nevada, Burleigh County Social Services and the Burleigh County State’s Attorney’s Office received reports from family members that if the child were to remain in the care of his maternal grandmother, the child would be subjected to future trauma.  The reports indicated that the maternal grandmother was in an abusive relationship and that domestic violence incidents were common at her home.  As a result, the State’s Attorney’s Office petitioned the juvenile court for a temporary shelter care order.  The juvenile court granted the request and ordered the child be temporarily placed with Burleigh County Social Services for sixty days, beginning March 19, 2010. 

[¶4] Burleigh County Social Services placed the child with a foster parent on March 19, 2010, and informed the father of the placement.  The father did not come forward at that time to request custody of the child.  On April 16, 2010, the State, in two separate petitions, asked the juvenile court to find the child was a deprived child and to terminate the parental rights of the father.  The child’s maternal aunt was named a party in the deprivation case and three other parties were granted the right to intervene in the deprivation and termination of parental rights cases.  In May 2010, the child was removed from the care of his foster parent and was placed in the care and custody of the parents of his mother’s ex-boyfriend, where he remained while waiting for  the juvenile court’s decision.

[¶5] The hearings on both petitions took place on August 19 and 20, 2010.  The State offered testimony from a number of witnesses, including the child’s foster parent, the child’s therapist, and social workers from Burleigh County Social Services.  The testimony of these witnesses focused primarily on the severe emotional problems the child suffered after witnessing his mother’s violent murder and on the child’s need for a stable, safe, and permanent living environment. 

[¶6] The State presented the testimony of the child’s foster parent, who is an occupational therapy assistant trained to work with special needs children and who cared for the child immediately after the mother’s murder.  She testified that, while in her care, the child suffered from recurring nightmares and needed to be with her at all times.  In particular, she testified she had to wrap the child in a blanket and hold him like a baby for extensive periods of time to keep him calm.  The foster parent further stated she received specific training from the child’s therapist to address the child’s special needs. The foster parent opined the child needed routine and consistency in his life to continue the healing process and noted the child should be placed in a home where domestic violence is not present.

[¶7] The State also offered the expert testimony of the child’s therapist who testified about the extent of the child’s emotional trauma and the details of his therapy.  The therapist stated she began working with the child the day after the mother’s murder.  She explained that through the use of play therapy, the child shared with her that he witnessed not only the death of his mother, but also a number of domestic violence incidents in which his mother was the victim.  Specifically, the child witnessed his stepfather drag his mother around the home, run water over her head in the bathtub, stab and beat her continually, and finally, violently murder her.  The therapist opined that, as a result of these experiences, the child developed severe emotional trauma symptoms, including dissociation, heightened anxiety, constant fear for his safety, and a regression in childhood development activities, such as bathroom training.  She testified the trauma symptoms exhibited by the child were the worst she has observed in her treatment of over 500 children with special needs and opined the child needed a consistent, stable, safe, and nurturing environment if the child were to continue the healing process.  The therapist further stated the child needed a caregiver who could effectively treat the child’s emotional disorders in a home environment.  Lastly, she testified that if the child were not placed in the appropriate environment, the child would likely regress and suffer additional emotional harm.

[¶8] The testimony of the social workers from Burleigh County Social Services further showed the child had been exposed to a number of domestic violence incidents before witnessing his mother’s murder.  One of the social workers testified the father was aware of some of these incidents, but failed to take any steps to ensure the welfare of the child.  In addition, the social worker assigned to the child’s case after the mother’s murder expressed concerns about the father’s inability to meet the child’s needs.  She opined the causes of the child’s deprivation were likely to continue absent termination of parental rights and recommended the father’s rights be terminated and the child be placed in a steady family. 

[¶9] The State also presented testimony regarding the father’s prior criminal convictions.  These convictions included a conviction for aggravated assault, for which the father was sentenced to five years in prison, with all but two years suspended.  The conviction arose out of an incident, in which the father stabbed one victim with a knife and hit another victim on the head with a hammer.  The father was further convicted of simple assault for a domestic violence incident, in which the victim was the child’s mother.  Moreover, the mother’s ex-boyfriend testified about a number of violent incidents involving the child’s mother and father and described the relationship between the two of them as “rocky.”  Despite his criminal history, however, the evidence presented at the hearings established the father had failed to complete any anger management or domestic violence treatment programs.  The evidence did show the father had completed a cognitive restructuring course while serving his sentence for aggravated assault. 

[¶10] The father testified on his behalf.  He stated he lived in Washington state with his girlfriend and their two young children, a fourteen-month-old infant and an eight-

day-old baby as of the time of the hearings.  He explained the monthly rent for their home is $1,000, although they often pay less because he fixes things around the house in exchange for rent.  The father testified that if the child were to live with him, the child would have its own room in the house.  He stated his girlfriend was nervous about having the child live with them, but asserted she would support the move. 

[¶11] The father further testified he worked for a construction company in Washington, making about $700 per week.  However, he explained his income fluctuates based on the demand for work.  When questioned about his lack of child support payments, the father replied he sent money directly to the mother for a while until he heard reports from the mother’s brother that she was drinking and using drugs.  The father did not provide any evidence showing these payments were in fact made and received by the mother.  The only evidence presented at the hearings regarding the father’s child support obligations was the testimony of an investigator for the Department of Human Services’ Child Support Enforcement Division.  The investigator testified the father owed $7,559.99 in arrearage as of the date of the hearings.  She also testified that within the three years the father had child support obligations, he made no payments other than the income withholdings the State received while the father was in prison.  

[¶12] In his testimony, the father admitted he has had limited contact with the child since the child’s birth, but asserted he was unable to spend more time with the child because he was incarcerated when the child was born and moved to Washington  shortly after his release from prison.  He testified, however, that despite the distance, he “tried to be there” for the child as much as he could.  The father explained he attempted to stay in contact with the child over the telephone when he first moved to Washington.  He also paid for the mother and the child’s airfare to Washington over Christmas in 2008.  After the Christmas visit, however, the father did not see the child again until after the mother’s death.

[¶13] The juvenile court issued findings of fact and orders on August 27, 2010.  The court found the child is a deprived child because the child lacked the “proper parental care or control, subsistence, or other care or control necessary for his physical, mental, or emotional health or morals.”  The court further found the deprivation is not due primarily to the lack of financial means of the father.  Additionally, the juvenile court found the causes and conditions of the child’s deprivation are likely to continue because the father has shown little effort in developing a positive parent relationship with the child, has not cooperated with Social Services, has not been trained in how to effectively meet the special needs of the child, and has not undergone any treatment regarding his criminal history of violent acts.  The court found the child will probably suffer serious emotional harm if the child is removed from his present home environment and placed with the father.  The court explained the child’s ability to recover from future trauma will be diminished if the child were to live with the father, most likely resulting in the child developing serious mental and emotional disorders.  The juvenile court concluded the State proved by clear and convincing evidence the child is a deprived child, the causes and condition of deprivation are likely to continue, and the child will probably suffer serious harm absent termination of parental rights.  Accordingly, the juvenile court terminated the father’s parental rights to the child.  The father appeals.

II

[¶14] A juvenile court may terminate a parent’s right to a child if:  (1) the child is a deprived child; (2) the conditions and causes of deprivation are likely to continue; and (3) the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm.  N.D.C.C. § 27-20-44(1)(c)(1).  The party seeking termination must prove these elements by clear and convincing evidence.  
Interest of A.B.
, 2009 ND 116, ¶ 16, 767 N.W.2d 817.  “Clear and convincing evidence means evidence that leads to a firm belief or conviction the allegations are true.”  
Id.
  On appeal, we will not reverse the juvenile court’s findings of fact unless they are clearly erroneous.  
Id.
  “A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if no evidence exists to support the finding, or if, on the entire record, we are left with a definite and firm conviction a mistake has been made.”  
Id.

III

[¶15] The father argues the juvenile court erred in finding the State proved by clear and convincing evidence the child was a deprived child.  He asserts he is “ready, willing, and able to provide the necessary care” for the child and argues that although “[h]e may not be a perfect parent[,] [] perfection is not required of a parent in order to prevent a finding that a child is deprived.”  He further asserts his inability to pay child support “has been hampered by first, his incarceration, [and] second, by his inability to find consistent, permanent employment against which a wage withholding order could be imposed.”

[¶16] A deprived child is a child “without the proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child’s physical, mental, or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of the child’s parents, guardian, or other custodian.”  N.D.C.C. § 27-20-02(8)(a).  “Proper parental care” means the minimum standard of care the community will tolerate.  
Interest of T.A.
, 2006 ND 210, ¶ 12, 722 N.W.2d 548.  A parent’s past conduct can form the basis for a reasonable prediction of a parent’s future behavior.  
Interest of B.B.
, 2008 ND 51, ¶ 9, 746 N.W.2d 411.  Moreover, a child may be deprived even when the child has been receiving adequate care from a source other than the parent.  
Interest of T.J.O.
, 462 N.W.2d 631, 633 (N.D. 1990).  When a party appeals a juvenile court’s finding of deprivation, we review “the files, records, and minutes or transcript of the evidence” and give “appreciable weight to the findings of the juvenile court.”  N.D.C.C. § 27-

20-56(1).

[¶17] The record here indicates the father has had very limited contact with the child throughout the child’s life.  The father saw the child for the first three months after the child was born.  The visits took place once a week or once every two weeks because the mother took the child to the James River Correctional Center where the father was serving a sentence for aggravated assault.  The record further shows the father’s contacts with the child remained very limited after the father’s release from prison.  Following his release, the father moved from North Dakota to Washington.  The father testified that after the move to Washington, he tried to stay in touch with the child by calling the child’s mother and asking to speak to the child.  Additionally,  the father testified he paid for the mother’s and the child’s airfare from North Dakota to Washington, so that they could spend Christmas together in 2008.  This was the last time the father saw the child until after the mother’s death in March 2010.  Moreover, although the record indicates that in early 2009 the father received reports from family members that the mother was drinking, using drugs, and possibly endangering the child, the father made no attempts to contact law enforcement, Social Services, or relatives to check on the child’s welfare.  He made no efforts to intervene or protect the child.

[¶18] In addition, the record is replete with evidence to support the juvenile court’s finding the child suffered severe emotional problems after witnessing the violent murder of his mother.  Testimony at trial revealed that the child had also witnessed numerous incidents of domestic violence against his mother.  As a result, the child has been receiving intensive therapy for his emotional and mental problems since the death of his mother.  

[¶19] Finally, the record establishes the father’s criminal history consists of convictions for aggravated assault and a simple domestic assault involving the child’s mother.  Despite his prior convictions and violent tendencies, however, the father has not completed an anger management course, a requirement of his probation, and has not entered into any domestic violence treatment programs.  Other than completing a cognitive restructuring course while incarcerated, the father has not taken any steps to show his commitment to avoid future incidents of anger and violence.

[¶20] Based on the entire record, we hold the juvenile court did not err in concluding the State proved by clear and convincing evidence the child is a deprived child “without the proper parental care or control, subsistence, or other care or control necessary for [the child’s] physical, mental, or emotional health or morals.”  Moreover, although the juvenile court found the child had been receiving proper parental care and control in his current placement, adequate care from a foster parent or a source other than the parent does not prevent a finding of deprivation.  
Interest of T.J.O.
, 462 N.W.2d at 633.

 

IV

[¶21] The father argues the juvenile court erred in finding the State proved by clear and convincing evidence the deprivation of the child was likely to continue.  He asserts he was not given an opportunity to show the child would not be deprived if the child were living with him.  He further argues that once a juvenile court finds a child is deprived, the parent is typically assisted by the appropriate social services agency, which sets certain goals the parent must achieve before reunification with the child.  The father contends he was not given such an opportunity.

A

[¶22] We have consistently held that “[i]n determining whether the causes and conditions of deprivation will continue or will not be remedied, evidence of past deprivation alone is not enough, and there must be prognostic evidence.”  
Interest of A.B.
, 2009 ND 116, ¶ 18, 767 N.W.2d 817.  Prognostic evidence is evidence that “forms the basis of reasonable prediction as to future behavior.”  
Id.
  “Evidence of the parent’s background, including previous incidents of abuse and deprivation, may be considered in determining whether deprivation is likely to continue.”  
Id.
  Prognostic evidence also includes the opinions of the professionals involved.  
Interest of K.J.
, 2010 ND 46, ¶ 8, 779 N.W.2d 635.  Further, a parent’s lack of cooperation with social service agencies indicates the causes and conditions of deprivation are likely to continue or will not be remedied.  
Interest of T.A.
, 2006 ND 210, ¶ 16, 722 N.W.2d 548.  Lastly, in determining whether deprivation is likely to continue, a juvenile court may consider the amount of contact the parent has had with the child.  
Interest of A.S.
, 2007 ND 83, ¶ 19, 733 N.W.2d 232.

[¶23] The record supports the juvenile court’s finding the father’s contact with the child has been extremely limited throughout the child’s life.  In fact, the record shows that after his release from prison in early 2008, the father saw the child only once before the mother’s death.  Moreover, the father has shown little interest in developing a positive relationship with the child even after the mother’s death.  Evidence presented at the hearings revealed that, although the father has been back to North Dakota for court appearances, he “has only arranged hasty, last-minute meetings” with the child.  The child’s social worker testified the father has had a total of four visits with the child since the mother’s death.  Two of these visits lasted about an hour.  One of the visits lasted no more than twenty minutes.  The social worker further testified the father called in advance for only one of the four visits; the other visits were organized at the last minute.  The father’s failure to provide advance notice to Social Services is only one example of his lack of cooperation with the appropriate social service agencies.  The social worker also testified the father did not inform the agency of his change in address and did not attend or participate by telephone in the child and family team meeting, even though Social Services notified him of the meeting. 

[¶24] Further, the opinions of the professionals involved support the juvenile court’s finding the causes and conditions of the child’s deprivation are likely to continue.  Both the child’s therapist and the child’s social worker testified that at the time of the termination hearings, the father had not begun to address the issues underlying and causing the child’s deprivation.  The child’s therapist stated the father had not participated in the child’s therapy and had not shown any interest in learning how to effectively address the child’s special needs.  In fact, he had not even contacted the therapist to inquire about the child’s therapy.  Additionally, the record demonstrates the father has shown little interest in the welfare of the child both before and after the mother’s death.  For example, although the father received reliable reports in early 2009 that the mother was using alcohol and drugs, he did nothing to address her substance abuse and the possible danger it presented for the child.  Similarly, although the father was aware the child suffered severe emotional trauma after witnessing his mother’s murder, the father did nothing to educate himself about the emotional needs of the child or to learn how to effectively address these needs.  

[¶25] The State presented clear and convincing evidence the causes and conditions of the child’s deprivation are likely to continue or will not be remedied if the child is placed with the father.  Therefore, the juvenile court’s finding deprivation is likely to continue is not clearly erroneous.

B

[¶26] Section 27-20-32.2(2), N.D.C.C., requires that the State make reasonable efforts to reunify families.  Reasonable efforts include:

[T]he exercise of due diligence, by the agency granted authority over the child . . . to use appropriate and available services to meet the needs of the child and the child’s family in order to prevent removal of the child from the child’s family or, after removal, to use appropriate and available services to eliminate the need for removal, to reunite the child and the child’s family, and to maintain family connections.  In determining reasonable efforts to be made with respect to a child . . . and in making reasonable efforts, the child’s health and safety must be the paramount concern.

N.D.C.C. § 27-20-32.2(1).  The State, however, is not required to “exhaust every potential solution before seeking termination of parental rights.”  
Interest of A.B.
, 2009 ND 116, ¶ 25, 767 N.W.2d 817.  

[¶27] Here, the juvenile court concluded the State proved by clear and convincing evidence it made reasonable efforts to reunite the father and the child.  Specifically, the court found the State’s efforts included an invitation by Burleigh County Social Services for the father to participate in the child and family team meetings, “trauma focused therapy at the Children’s Advocacy Center; therapeutic foster care while [the child was] placed in shelter care; coordinated visits with relatives, including [the father]; and home studies.”  The record supports the juvenile court’s findings.

[¶28] At the hearings, the child’s social worker testified about Burleigh County Social Services’ reasonable efforts to reunify the child and the father.  She stated Social Services contacted the father shortly after the mother’s murder and informed him of the child’s placement in foster care and the child’s therapeutic treatment.  She also explained Burleigh County Social Services set specific goals the father had to accomplish before reunification could take place.  The goals set for the father required him to cooperate in the completion of a home study, to keep the agency updated on his contact information, to request visits with the child in advance, and to participate in the child and family team meetings, which the agency requires for all children in foster care.  The child’s social worker testified the father failed to accomplish the goals set for him.  In particular, she explained the home study of the father’s Washington home was delayed because the father failed to provide Burleigh County Social Services with his  new address.  She further testified the father failed to 
request visits with the child in advance and often did not ask to see the child until the last minute.  Moreover,  at the time of her testimony, the father had not requested a visit, even though he was present at the hearings.  Finally, the social worker stated the father attended only one of the two scheduled child and family team meetings.  She explained the agency mandates such meetings take place every three months.  The purpose of the meetings is to discuss the progress of the child, to set goals for all parties involved, and to determine the tasks necessary to accomplish these goals.  The social worker testified the father attended the April 8, 2010, meeting by telephone, but failed to attend the July 21, 2010, meeting.  She stated Social Services notified the father of the meeting by mail and by leaving a voice mail on his telephone.  However, the father still failed to participate in the meeting.  All other interested parties were present.  

[¶29] In addition to not participating in the child and family team meeting, the father  also did not participated in the child’s therapy.  The therapist testified the father had failed to educate himself about the child’s emotional needs and had not inquired about being a part of the child’s therapy.  She explained the father had never contacted her, even though Social Services had informed him about the child’s therapeutic treatment.  The testimony of the child’s therapist and social worker support the juvenile court’s findings the State made reasonable efforts to reunify the father with the child.  The State provided the father with appropriate services and set clear goals for him, most of which he failed to accomplish.  Accordingly, the court’s findings that there was clear and convincing evidence that the State made reasonable efforts to reunify the father with the child are not clearly erroneous.

V

[¶30] The father argues the juvenile court erred in finding the State proved by clear and convincing evidence the child will probably suffer serious harm absent termination of parental rights.  Specifically, the father argues the State presented no evidence the child will suffer harm if the child were placed in his care. 

[¶31] “Upon a showing that a child’s deprivation is likely to continue in an action to terminate parental rights, it must be shown that the child is suffering or will probably suffer some serious physical, mental, moral, or emotional harm.”  
Interest of A.B.
, 2009 ND 116, ¶ 21, 767 N.W.2d 817.  “The probability of serious mental and emotional harm to a child may be established by prognostic evidence that a parent’s current inability to properly care for the child will continue long enough to render improbable the successful assimilation of the child into a family if the parent’s rights are not terminated.”  
Id.
  “The risk of future harm may be based on evidence of previous harm.”  
Id.

[¶32] The record supports the juvenile court’s finding the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm if placed in the father’s care.  The testimony of the child’s social worker and the child’s therapist indicated that removing the child from his current placement and placing him in the father’s home would be contrary to the child’s welfare.  

[¶33] The therapist testified the child suffered from severe emotional trauma, including dissociation, heightened anxiety, and fear for his safety.  She explained the child’s caregivers had to be patient, nurturing, and able to provide a safe and stable home environment, in which the child could continue the healing process.  The therapist testified the father was unfamiliar with the severity of the child’s emotional trauma and the treatment the child required.  Moreover, the father himself admitted that, although he knew the child was in therapy, he did not know or understand the details of the child’s emotional trauma.  The therapist opined that, if placed with the father, the child was likely to regress and his emotional trauma symptoms were likely to get worse.  In particular, the therapist testified that if not properly treated, the child was likely to suffer further mental health harm, which could potentially lead to severe emotional and mental disorders, such as anti-social personality disorder, schizophrenia, and multiple personality disorder. 

[¶34] The father’s criminal convictions for violent acts further support the juvenile court’s finding the child would probably suffer serious harm if placed with the father.  The record indicates the father has made only minimal steps toward addressing his history of anger and domestic violence.  At the time of the hearings, the father had only completed a cognitive restructuring course.  He had not entered any anger management or domestic violence treatment programs.  Given the father’s history of violence and his failure to obtain treatment, the social worker expressed concerns about the father’s ability to successfully meet the child’s emotional needs.  Furthermore, the child’s therapist strongly advised against placing the child in a home with a history of domestic violence because such a placement would likely cause the child serious mental and emotional harm.  Accordingly, the juvenile court did not err in finding the State proved by clear and convincing evidence the child will probably suffer serious harm absent termination of parental rights.

VI

[¶35] We conclude the juvenile court did not err in finding the child is deprived and terminating the father’s parental rights to the child because the State proved by clear and convincing evidence the child is a deprived child, the causes and conditions of the child’s deprivation are likely to continue, and the child will probably suffer serious harm if the father’s parental rights were not terminated.

[¶36] We affirm the juvenile court’s order affirming the orders of the Judicial Referee dated August 27, 2010. 

[¶37] Mary Muehlen Maring

Daniel J. Crothers

Dale V. Sandstrom

Carol Ronning Kapsner

Gerald W. VandeWalle, C.J.