2017 ND 178

IN the INTEREST OF A.B., a Child

State of North Dakota, Petitioner
and Appellee

v.

A.B., Child, J.C. n/k/a J.B., Mother, Jan-
ice Briese, Guardian ad Litem, and
the Executive Director of ND Depart-
ment of Human Services, Respondents

and

D.B., Father, Respondent
and Appellant

In the Interest of M.V.B., a Child

State of North Dakota, Petitioner
and Appellee

v.

M.V.B., Child, J.C. n/k/a J.B., Mother,
Janice Briese, Guardian ad Litem, and
the Executive Director of ND Depart-
ment of Human Services, Respondents

and

D.B., Father, Respondent
and Appellant

No. 20170205, No. 20170206

Supreme Court of North Dakota.

Filed 7/12/2017 by Clerk
of Supreme Court

Andrew D. Delain, State's Attorney, Bismarck, ND, for petitioner and appellee.

Susan Schmidt, Bismarck, ND, for respondent and appellant D.B., Father.

Kapsner, Justice.

[¶1] The biological father of two minor children appeals from a juvenile court order terminating both parents' parental rights to their children. The father argues the State failed to prove by clear and convincing evidence the grounds for termination under N.D.C.C. § 27-20-44(1)(c)(1) and Grant County Social Services failed to use reasonable efforts to reunite the parents with their children. We conclude the juvenile court did not err in finding clear and convincing evidence to support the termination of the father's parental rights and in finding Grant County Social Services used reasonable efforts to reunite the father with his children. We affirm.

I

[¶2] The parents are the biological father and mother of a son born in December 2014, and a daughter born in December 2015. On January 21, 2015, Amy Lipke, a social worker for Grant County Social Services, investigated a report of suspected child abuse involving the father and his one month old son. According to Lipke, she was overwhelmed by the odor of cat urine throughout the parents' Grant County home in New Leipzig and she observed a bed in the home was soaked with cat urine and a liter box with cat feces near the son's bassinet. Lipke testified the home was the second worst home she had seen in her eighteen years as a child protection worker, and she sought and obtained an order for emergency removal of the son from the home. The son was removed from the parents' home on January 21, 2015, and ultimately was placed in a foster home, where he has remained since being removed from the parents' home.

[¶3] According to Kristen Wentz–Krumwiede, a social worker for Grant County Social Services, she also observed the parents' home on January 21, 2015, and found an overwhelming smell of cat urine throughout the home, large amounts of cat feces near the son's bassinet, and filth throughout the home. She testified a social services team meeting was held within thirty days after removal of the son from the parents' home and the parents were provided information about goals and requirements necessary for reunification with their son, including cleaning their home or finding suitable sanitary housing, completing a parental capacity assessment and obtaining recommended services, and communicating and cooperating with Grant County Social Services. The parents were also required to maintain contact with an appointed guardian ad litem, Janice Briese. According to Wentz–Krumwiede, Grant County Social Services thereafter held quarterly team meetings with the parents with a goal for reunification of the family.

[¶4] The parents completed a parental capacity assessment in March 2015, which revealed both parents lacked necessary parenting skills and needed training. Dr. Lisa Hay, a licensed psychologist at West Central Human Services Center, administered the assessment and testified the father has difficulty acquiring proper parenting skills and is suspicious of others, particularly social services personnel. The parents attended a parenting class and tests administered before and after the class showed little improvement by the mother and a decline in parenting skills by the father. Grant County Social Services obtained a computerized electronic doll to monitor the parents' parenting skills, but the doll was not used because the parents either did not have a sanitary home or their residence was not known, and the

father also objected to using the doll to monitor his parenting skills.

[¶5] The parents' daughter was born in December 2015, and she was immediately placed in the same foster home with her brother due to concerns about the unsanitary living conditions in the parents' home and their lack of parenting skills. The daughter has been in custody of Grant County Social Services in the same foster home with her brother since her birth in December 2015, and reunification and care plans for both children were merged.

[¶6] According to Wentz–Krumwiede, although the parents initially demonstrated some compliance with Grant County Social Services' recommendations for reunification of the family, they failed to make adequate progress with the recommendations. She testified the parents moved from New Leipzig to Elgin sometime after their son was removed from their home and an inspection of their home in Elgin revealed unsanitary conditions and health concerns. According to Wentz–Krumwiede, the parents were evicted from their Elgin home in March 2016, and thereafter lived in their vehicle or in motels in Bismarck or Dickinson until finding a suitable home in Dickinson shortly before trial. Wentz–Krumwiede testified Grant County Social Services did not always know where the parents were living and was frequently unable to contact the parents. Moreover, she testified the parents did not maintain contact with Grant County Social Services, which hindered efforts at reunification with their children.

[¶7] According to Wentz–Krumwiede, the parents initially were scheduled for weekly two hour supervised visitations with their son and later with both children at the Family Connection Safe Visitation Center in Dickinson, but their attendance at the visitations was sporadic. She testified Grant County Social Services provided the parents with some financial assistance, including cell phone minutes so they could keep in contact with social services, money for gas and automobile repairs, and temporary hotel accommodations and meals for court proceedings. According to Wentz–Krumwiede, Grant County Social Services initially also provided a parent aide for household cleaning, but the father asked the aide to leave the home. Wentz–Krumwiede testified the parents failed to attain adequate parenting skills to obtain more than weekly supervised visitation with their children, and although the parents completed a parenting class in Dickinson, they had not progressed to a level for additional or unsupervised visitation with their children.

[¶8] There was evidence the parents failed to maintain contact with the guardian ad litem, Briese, and failed to cooperate with her for home visits. According to Briese, the father indicated he did not need to use the computerized electronic doll to learn how to parent. Briese testified the children's welfare was not the parents' highest priority and they never expressed a desire to see the children for more than their scheduled weekly supervised visitation. Although Briese recognized the parents had made some progress by the time of trial, she recommended termination of the parents' parental rights.

[¶9] In September 2016, the State filed a petition to terminate the parents' parental rights to their son and a separate petition to terminate the parents' parental rights to their daughter. The petitions alleged aggravated circumstances, claiming the children were abandoned and the parents failed to make substantial, meaningful efforts to secure treatment for addictions, mental illnesses, or behavioral disorders. The petitions also alleged the children were deprived, the causes of deprivation were likely to continue or would not be

remedied, and the children were suffering or would likely suffer serious physical, mental, moral or emotional harm. The petition to terminate the parents' parental rights to their son further alleged deprivation and the son had been in foster care for 601 straight nights.

[¶10] After a March 2016 trial, the juvenile court found there was not clear and convincing evidence of aggravated circumstances and declined to terminate the parents' parental rights to their children on that ground. However, the court terminated the parents' parental rights to their children under N.D.C.C. § 27-20-44(1)(c)(1), finding clear and convincing evidence that the children are deprived, that the conditions and causes of deprivation are likely to continue or will not be remedied, and that, as a result, the children will probably suffer serious physical, mental, moral, or emotional harm. The court also terminated the parents' parental rights to their son under N.D.C.C. § 27-20-44(1)(c)(2) on the ground that he was deprived and had been in foster care for more than 450 out of the previous 660 days.

## II

[¶11] As relevant to the issues raised in this appeal, N.D.C.C. § 27-20-44(1)(c)(1) authorizes a juvenile court to terminate parental rights if a "child is a deprived child and the court finds ... [t]he conditions and causes of the deprivation are likely to continue or will not be remedied and that by reason thereof the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm[.]" A petitioner must establish all of the elements for termination by clear and convincing evidence. *In re A.L.*, 2011 ND 189, ¶ 8, 803 N.W.2d 597. Clear and convincing evidence is evidence that leads to a firm belief or conviction the allegations are

true. *In re C.N.*, 2013 ND 205, ¶ 6, 839 N.W.2d 841.

[¶12] We will not overturn a juvenile court's findings of fact in a termination proceeding unless the findings are clearly erroneous under N.D.R.Civ.P. 52(a). *A.L.*, 2011 ND 189, ¶ 6, 803 N.W.2d 597. A finding of fact is clearly erroneous under N.D.R.Civ.P. 52(a) if it is induced by an erroneous view of the law, if there is no evidence to support it, or if, on the entire record, we are left with a definite and firm conviction a mistake has been made. *A.L.*, at ¶ 6. In reviewing findings of fact, a "reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." N.D.R.Civ.P. 52(a)(6).

## III

[¶13] The father argues the State failed to prove by clear and convincing evidence that the children are deprived and that the causes of deprivation are likely to continue with resulting harm to the children. He claims both parents have completed counseling programs and shown good progress, and they have obtained the services of a parental aide on their own to work toward becoming better parents. He also argues the only evidence of harm to the children is that they had developed a bond with their foster parents and it would be harmful to remove them from foster care.

[¶14] A child is deprived if the child:

Is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of the child's parents, guardian, or other custodian.

N.D.C.C. § 27-20-02(8)(a).

[¶15] A parent's conduct in raising their child must satisfy minimum stan-

dards the community will tolerate. *In re K.B.*, 2011 ND 152, ¶ 10, 801 N.W.2d 416. "A parent must be able to demonstrate present capability, or capability within the near future, to be an adequate parent." *C.N.*, 2013 ND 205, ¶ 9, 839 N.W.2d 841(quoting *In re K.L. and M.S.*, 2008 ND 131, ¶ 23, 751 N.W.2d 677).

■ [¶16] Evidence of past deprivation is not enough to determine whether the causes and conditions of deprivation will continue; rather, there must also be prognostic evidence. *In re A.B.*, 2010 ND 249, ¶ 22, 792 N.W.2d 539. Prognostic evidence is that which "forms the basis for a reasonable prediction as to future behavior." *In re A.S.*, 2007 ND 83, ¶ 19, 733 N.W.2d 232 (quoting *In re L.F.*, 1998 ND 129, ¶ 16, 580 N.W.2d 573). Evidence of a parent's background or history may be considered in determining whether the deprivation is likely to continue. *K.B.*, 2011 ND 152, ¶ 12, 801 N.W.2d 416. "A parent's past conduct can form the basis for a reasonable prediction of a parent's future behavior." *A.B.*, at ¶ 16. A court may also consider the amount of contact the parent has had with the child. *Id.* at ¶ 22. A parent's lack of cooperation with social service agencies is also relevant and provides evidence the causes and conditions of deprivation are likely to continue. *E.g., In re T.H.*, 2012 ND 38, ¶ 29, 812 N.W.2d 373; *K.B., at ¶ 12; A.B.*, at ¶ 22.

[¶17] Upon a showing that the child is deprived and the causes and conditions of deprivation are likely to continue, a petitioner must also prove the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm. N.D.C.C. § 27-20-44(1)(c)(1); *see also A.B.*, 2010 ND 249, ¶ 31, 792 N.W.2d 539. The risk of future harm may be based on evidence of past harm and may also be established by prognostic evidence that the parent's current inability to care for the child will continue long enough to make the child's successful assimilation into a family improbable if the parent's rights are not terminated. *Id.*

■ [¶18] Here, the juvenile court found:

I do find by clear and convincing evidence that the children are deprived, that the conditions and causes of deprivation are likely to continue or will not be remedied, and that by reason thereof, the children ... will probably suffer serious physical, mental, moral, or emotional harm. This finding is based on my earlier findings above. [The son] was removed from the parental home on 21 January 2015, when he was one month old. [The daughter] was removed from the parental home on at her birth on 06 December 2015. The children ha[ve] been together in continuous foster care ever since. They were previously found to be deprived and placed into the legal care, custody, and control of Grant County Social Services. The removal from the home and earlier adjudication for deprivation were based on the filthy, unhealthy home environment provided by the parents, and the parents' lack of parenting skills and inability to provide proper parenting. Social Services early on tried to initiate a number of programs to cure the causes of deprivation. Those measures included in-home parent aid[e] services, counseling, psychological and parental capacity evaluations, parenting classes, and supervised visits. In addition, Social Services required the parents to obtain suitable housing. Social Services provided financial assistance in a number of ways to facilitate the parents' participation in and completion of these programs. Those efforts have been unsuccessful. The evaluations and programs have yielded virtually no progress in improving parenting skills.

The parents have only ever had supervised visits one time per week for over two years. The parents have little or no insights or understanding as to why they are in this situation and what they should have done to get out of it. The parents have not developed a true parent-child bond and relationship with their children. The parents show little interest or motivation in accepting the benefits of these programs and improving as parents. Instead they have reacted to Social Services' efforts with distrust and resentment. They have not put their children first. I recognize that the parents' backgrounds and mental framework are such that it is harder for them to progress, but they show little or no inclination or desire to give the necessary effort to this cause. For these reasons, I find that the conditions and causes of deprivation are likely to continue or will not be remedied. Even if they could be remedied, it will take too long. No witness could say when if ever the parents will remedy the causes and conditions of deprivation. The children know their biological parents, but only as someone they come into temporary contact with, much like a day care provider. In the meantime, the children will very probably suffer serious and great emotional and mental harm as a result of this, and the risk of greater harm becomes ever greater with each passing day.

[¶19] Evidence in this record establishes that when the children were placed in foster care, the parents' home failed to satisfy minimum standards for the community and the parents lacked parenting skills necessary to meet those minimum standards. There is also evidence in this record that the father failed to communicate and cooperate with Grant County Social Services' recommendations for reunification with the children. This record does not establish the father has the present capability, or capability in the near future, to satisfy minimum standards required to be an adequate parent, and his lack of cooperation with Grant County Social Services provides evidence the causes and conditions of the children's deprivation are likely to continue. Although both parents made some progress toward obtaining necessary parenting skills and reunification after the petitions for termination were filed in these cases, we have often said children need stability in their lives and should not be required to remain in an indeterminate status between foster care and the need for permanent placement while parents attempt to overcome their inability to effectively parent. *E.g., In re J.S.L.*, 2009 ND 43, ¶ 30, 763 N.W.2d 783; *In Interest of T.J.L.*, 2004 ND 142, ¶ 11, 682 N.W.2d 735.

[¶20] Evidence in this record supports the juvenile court's findings and determination on the legal requirements for termination of the father's parental rights. We do not reweigh the evidence, and we are not left with a definite and firm conviction the court made a mistake in finding the children are deprived, the causes of deprivation are likely to continue, and that by reason thereof, the children are suffering or will probably suffer serious physical, mental, moral, or emotional harm. We conclude the court did not clearly err in finding the legal requirements for terminating the father's parental rights.

IV

[¶21] The father also argues Grant County Social Services failed to use reasonable efforts to reunite the parents with the children under N.D.C.C. § 27-20-32.2.

[¶22] A juvenile court's findings about whether the State has made reasonable efforts to reunify children with par-

ents are reviewed under the clearly erroneous standard. *In Interest of R.L.-P.*, 2014 ND 28, ¶ 25, 842 N.W.2d 889; *In re A.B.*, 2009 ND 116, ¶ 26, 767 N.W.2d 817. Section 27-20-32.2, N.D.C.C., requires the State to use reasonable efforts from appropriate and available services to reunify parents and children and provides, in part:

1. As used in this section, "reasonable efforts" means the exercise of due diligence, by the agency granted authority over the child under this chapter, to use appropriate and available services to meet the needs of the child and the child's family in order to prevent removal of the child from the child's family or, after removal, to use appropriate and available services to eliminate the need for removal, to reunite the child and the child's family, and to maintain family connections. In determining reasonable efforts to be made with respect to a child under this section, and in making reasonable efforts, the child's health and safety must be the paramount concern.

2. Except as provided in subsection 4, reasonable efforts must be made to preserve families, reunify families, and maintain family connections:

   . . . .

   b. To make it possible for a child to return safely to the child's home.

[¶23] A parent's failure to take advantage of provided services is not the fault of social services, and a parent's failure to participate in offered services does not constitute a failure to make reasonable efforts by social services. *In re K.L.*, 2008 ND 131, ¶ 20, 751 N.W.2d 677; *In re D.D.*, 2006 ND 30, ¶¶ 25-26, 708 N.W.2d 900.

[¶24] There is evidence in this record that Grant County Social Services provided the parents with numerous resources to help them provide a better environment for their family and to learn appropriate parenting skills. Grant County Social Services provided financial assistance to the parents in an attempt to facilitate the parents' participation in programming and services to work toward reunification. The juvenile court found "the parents show little interest or motivation in accepting the benefits of these programs and improving as parents. Instead they have reacted to Social Services' efforts with distrust and resentment." In addition, the court found, "Social services early on tried to initiate a number of programs to cure the causes of deprivation."

[¶25] Evidence in this record establishes the father's lack of cooperation and communication with Grant County Social Services and supports the juvenile court's findings about Grant County Social Services' use of available resources and reasonable efforts to reunify the parents with the children. We do not reweigh that evidence, and we are not left with a definite and firm conviction the court made a mistake. We therefore conclude the court did not err in finding Grant County Social Services used reasonable efforts to reunite the father with the children.

V

[¶26] We affirm the juvenile court order.

[¶27] Carol Ronning Kapsner

Lisa Fair McEvers

Daniel J. Crothers

Jerod E. Tufte

Gerald W. VandeWalle, C.J.